**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> WACHTEL MISSRY LLP <br><br> and <br><br> HOWARD KLEINHENDLER, <br><br> Defendants. | **Civil Action** <br><br><br> **COMPLAINT** <br><br> **(JURY TRIAL DEMANDED)** |

Plaintiff  Associated Industries Insurance Company, Inc. ("Associated"), by and through its undersigned counsel, by way of a Complaint against Defendants, Wachtel Missry LLP (the "Firm") and Howard Kleinhendler ("Kleinhendler") (collectively, "Defendants"), asserts as follows:

## NATURE OF THE ACTION

1.      This insurance coverage action relates to Lawyers Professional Liability Policy Number AES1058242 01, issued by Associated to the Firm for the policy period from October 19, 2018 to October 19, 2019 (the "Policy").  Associated seeks a judicial declaration that the Firm and Kleinhendler, a former partner in the Firm, are not entitled to coverage or defense under the Policy for a lawsuit brought against them by Allan H. Applestein ("Applestein") and Diatomite Corporation of America ("Diatomite"), currently pending in the United States District Court for the Eastern District of New York (the "Applestein Suit").[1]

---

[1] The Applestein Suit was transferred from the United States District Court for the Southern District of Florida to the Eastern District of New York, and is styled *Allan H. Applestein and Diatomite Corporation of America v. Howard Kleinhendler and Wachtel Missry LLP*, Case No. 1:20-cv-01454-AMD (E.D.N.Y.). A true and correct copy of the operative Amended Complaint filed in the Applestein Suit, with its exhibits, is attached hereto as Exhibit 1.

## PARTIES

2.      Plaintiff Associated is an insurance company organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

3.      On information and belief, the Firm is a New York Registered Limited Liability Partnership with its principal place of business at 885 Second Avenue, 47th Floor, New York, New York 10017.

4.      Based upon Associated's diligent search of both publicly available information and non-public information previously supplied to it by the Firm, Associated avers that each of the following individuals is a partner of the Firm, that none of the partners is a citizen of Florida, and further that each partner's citizenship is as stated:

      a.      Allan J. Weiss is a citizen of the State of New York;

      b.      Avram E. Posner is a citizen of the State of New York;

      c.      Dani Schwartz is a citizen of the State of New York;

      d.      Eli D. Dweck is a citizen of the State of New York;

      e.      Evan Weintraub is a citizen of the State of New Jersey;

      f.      Jeffrey R. Alexander is a citizen of the State of New York;

      g.      Jeffrey T. Strauss is a citizen of the State of New York;

      h.      Jordan Mautner is a citizen of the State of New York;

      i.      Marc Litt is a citizen of the State of New York;

      j.      Mia Stevens-Haynes is a citizen of the State of New Jersey;

      k.      Morris Missry is a citizen of the State of New York;

      l.      Scott J. Lesser is a citizen of the State of New Jersey;

      m.      Steven J. Cohen is a citizen of the State of New York; and

n.      William B. Wachtel is a citizen of the State of New York.

5.      Defendant Kleinhendler is a citizen of the State of New Jersey, and maintains a law office at 369 Lexington Avenue, 12th Floor, New York, New York 10017.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

7.      An actual justiciable controversy exists between Associated, the Firm, and Kleinhendler within the meaning of 28 U.S.C. § 2201 regarding whether Associated has a duty to defend or indemnify the Firm and/or Kleinhendler under the Policy with respect to the claims asserted in the Applestein Suit, as more particularly described below.

8.      The parties are of diverse citizenship, and jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332.

9.      The amount in controversy exceeds $75,000, exclusive of interest and costs.  As set forth below, the Policy that is the subject of this action has a limit of liability of $5,000,000 per claim, $5,000,000 aggregate, and the Applestein Suit, in which the Firm and Kleinhendler are named as defendants, involves alleged damages substantially in excess of $75,000.

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391, because the Firm is domiciled in the Southern District of New York, Kleinhendler was formerly a partner in the Firm and practiced in the Southern District of New York (and, upon information and belief, still does), and the Policy was issued to the Firm at its address in the Southern District of New York.

## BACKGROUND

### The Firm's Limited, Early Involvement with Applestein

11.     The Applestein Suit, and a variety of matters connected with it, arise from the alleged activities of Kleinhendler, formerly a partner in the Firm, in connection with Applestein, an elderly and allegedly wealthy Floridian.

12.     Applestein, through the "DCA Grantor Trust" of which he served as Managing Trustee, originally retained Kleinhendler and the Firm's predecessor, Wachtel Masyr LLP ("Wachtel Masyr"), in May 2009 to handle the pursuit of claims arising from the activities of Bernard Madoff.  A true and correct copy of an engagement letter between Wachtel Masyr and the DCA Grantor Trust, dated May 1, 2009, is attached hereto as Exhibit 2.

13.     Applestein, also through the DCA Grantor Trust, retained Kleinhendler and Wachtel Masyr again in January 2010 to assert claims against the United States for alleged negligence by the Securities and Exchange Commission in allowing Madoff to operate.  A true and correct copy of an engagement letter between Wachtel Masyr and the DCA Grantor Trust, dated January 29, 2010, is attached hereto as Exhibit 3.

14.     Applestein, through the DCA Grantor Trust, retained Kleinhendler and Wachtel Masyr yet again in March 2010 to pursue the collection of judgments previously entered against the Republic of Argentina and the Province of Buenos Aires.  A true and correct copy of an engagement letter between Wachtel Masyr and the DCA Grantor Trust, dated March 24, 2010, is attached hereto as Exhibit 4.

15.     The Firm and Kleinhendler admit that the three aforementioned discrete engagements were the sum total of Wachtel Masyr's and/or the Firm's legal services on behalf of Applestein or entities associated with him.

**Kleinhendler's Separate Business Relationship with Applestein**

16.     Separate and apart from the three aforementioned engagements through Wachtel Masyr, Applestein and Kleinhendler developed a business relationship in which Kleinhendler, for his own account and without involving Wachtel Masyr or the Firm, consulted for Applestein and/or his affiliated entities on business and real estate projects.

17.     Thus, in February 2010, Applestein and Kleinhendler entered into a memorandum of understanding in which Kleinhendler assumed a consulting role to assist an Applestein entity known as Haitian Equities, S.A. develop certain property in Haiti.  A true and correct copy of the memorandum of understanding, on Kleinhendler's personal letterhead and dated February 12, 2010, is attached hereto as Exhibit 5.  The endeavor was to involve a joint venture arrangement in which Kleinhendler was to receive a five percent share of the joint venture.  Neither Wachtel Masyr nor the Firm was involved in this business endeavor.

18.     In June 2010, Applestein, as Trustee for the "D.G.A. Grantor Trust," entered into a "commission agreement" with Kleinhendler whereby Kleinhendler undertook to help procure a buyer for a property in Tulsa, Oklahoma.  A true and correct copy of the commission agreement, on Kleinhendler's personal letterhead and dated June 3, 2010, is attached hereto as Exhibit 6.  The agreement provided that if Kleinhendler procured a buyer for a purchase price exceeding $5 million, the excess over $5 million would go to Kleinhendler as a commission of sale.  Neither Wachtel Masyr nor the Firm was involved in this business endeavor.  When the property ultimately was leased (rather than sold), Applestein or one of his affiliated entities paid $75,000 to Kleinhendler personally.

19.     Finally, in January 2011, Applestein, on behalf of Diatomite, entered into a commission agreement with Kleinhendler whereby Kleinhendler was engaged to help sell a large

tract of real estate in Richmond County, Virginia.  A true and correct copy of this commission agreement, on blank paper without letterhead and dated January 25, 2011, is attached hereto as Exhibit 7.  The agreement provided that if Kleinhendler procured a buyer for a purchase price exceeding $12.2 million cash, the excess over $12.2 million would go to Kleinhendler as a commission of sale.  Neither Wachtel Masyr nor the Firm was involved in this business endeavor.

20.     The Richmond County property in question is an approximately 1,000-acre parcel along the Rappahannock River known as the "Fones Cliffs Land."  Located in what is called the "Northern Neck" of Virginia, the Fones Cliffs Land is known for its white cliffs, formed from diatomaceous earth, or diatomite.  Applestein owned Diatomite, the corporation, which, in turn, owned the Fones Cliffs Land.

### Kleinhendler's Plan to Acquire and Develop the Fones Cliffs Land, and His Formation of Virginia True Corporation, in Which He Was a Major Stockholder and Executive Vice President

21.     After several potential deals to sell the Fones Cliffs Land fell through, in 2016, Kleinhendler formed a plan to acquire the Fones Cliffs Land for himself and another investor by the name of Benito R. Fernandez ("Fernandez").

22.     Kleinhendler planned to develop the Fones Cliffs Land into a tourism and entertainment destination that would include housing units, a resort hotel, and a golf course, among other things.

23.     The transaction was initially envisioned as a stock purchase transaction, whereby Kleinhendler and Fernandez would buy essentially all the stock in Diatomite and thereby acquire the Fones Cliffs Land.

24.     Ultimately, rather than a stock transaction, Kleinhendler instead formed a new company called Virginia True Corporation ("Virginia True") to acquire the land from Diatomite in a real estate purchase and sale transaction.

25.     Kleinhendler was both a stockholder and Executive Vice President of Virginia True.

26.     In April 2017, Diatomite and Virginia True entered into a Contract of Purchase and Sale, signed by Kleinhendler as Executive Vice President of Virginia True.  A true and correct copy of the Contract of Purchase and Sale, dated April 27, 2017, with its exhibits, is attached hereto as Exhibit 8.

27.     Pursuant to the Contract of Purchase and Sale, Virginia True bought the Fones Cliffs Land from Diatomite for a stated purchase price of $12 million.  That $12 million consisted of $5 million in cash and $7 million in the form of an unsecured promissory note.  The unsecured promissory note was attached as an exhibit to the Contract of Purchase and Sale and, again, was signed by Kleinhendler as Executive Vice President of Virginia True.  *See* Ex. 8, Contract of Purchase and Sale, at its exhibit C.

28.     Simultaneously, Applestein also agreed to loan $500,000 to "HK Consulting Group LLC" ("HK Consulting"), a New Jersey entity in which Kleinhendler was, on information and belief, the sole member and that operated at Kleinhendler's home address.  No security was given for the accompanying note, nor did Kleinhendler personally guarantee it.

29.     Despite the fact that Virginia True's $7 million promissory note to Diatomite was unsecured, Virginia True and Diatomite entered into a "Side Letter Agreement," also signed by Kleinhendler as Executive Vice President and Secretary of Virginia True.  A true and correct copy of the Side Letter Agreement is attached hereto as Exhibit 9.  The Side Letter Agreement provided that Virginia True would not encumber the Fones Cliffs Land "without the prior written consent of Allan Applestein and his legal counsel."

30.     Despite that promise, Kleinhendler, Fernandez, and Virginia True – allegedly without Applestein's knowledge or consent – contemporaneously entered into a Stockholders' Agreement with two additional investors – Domenick and Anthony Cipollone (the "Cipollones"). A true and correct copy of the Stockholders' Agreement, dated April 27, 2017, is attached as Exhibit C to the Applestein Suit Amended Complaint, which is attached hereto as Exhibit 1.

31.     Pursuant to the Stockholder's Agreement, the Cipollones paid $5 million for 32% of the stock in Virginia True (thus supplying the $5 million in cash that was in turn paid to Diatomite in connection with the Contract of Purchase and Sale).  In addition, the Stockholders' Agreement included a provision by which the Cipollones could, under certain circumstances, convert their equity investment into debt and encumber the Fones Cliffs Land as security for the debt.

**Subsequent Disputes and Litigation Involving the Fones Cliffs Land**

32.     The Fones Cliffs Land development was beset with difficulties of various sorts, many of them chronicled in an affidavit from a Virginia attorney named Robert Smith (the "Smith Affidavit"), who was engaged to represent Diatomite and later Virginia True in connection with zoning and development issues.  (The Smith Affidavit is Exhibit A to the Applestein Suit Amended Complaint, which is attached hereto as Exhibit 1.)  According to the Smith Affidavit, bills went unpaid, interactions with local officials were mishandled, environmental regulations were not followed, and financial reporting was chaotic.  Litigation of various types soon ensued.

33.     In September 2018, the Cipollones invoked the buy-out provision in their Stockholders' Agreement with Virginia True, seeking the return of their $5 million investment. Virginia True lacked the resources to purchase the Cipollones' shares.

8

34.     On October 9, 2018, the Commonwealth of Virginia filed suit against Virginia True in Richmond County Circuit Court, alleging multiple environmental violations including unauthorized clearing of land and mismanagement of stormwater and runoff.

35.     In December 2018, recognizing that Virginia True, Kleinhendler, and Fernandez could not make good on the buy-out obligations, the Cipollones sued Virginia True in Richmond County Circuit Court, seeking specific performance of the Cipollones' alternative entitlement to issuance of a $5 million note and a mortgage on the Fones Cliffs Land.

36.     A few days later, Virginia True executed a note (the "Cipollones Note") and deed of trust (the "Cipollones Deed of Trust"), both signed by Kleinhendler as its Executive Vice President.  A true and correct copy of the Cipollones Note is attached hereto as Exhibit 10.  A true and correct copy of the Cipollones Deed of Trust is attached as Exhibit D to the Applestein Suit Amended Complaint, which is attached hereto as Exhibit 1.  The combined effect of the Cipollones Note and Deed of Trust was to encumber the Fones Cliffs Land in the amount of $5 million, leaving the Cipollones with a secured status, in contrast to the unsecured status of Diatomite, which was still owed $7 million in connection with Virginia True's purchase of the Fones Cliffs Land.

37.     In May 2019, Virginia True filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of New York, Case No. 19-42769.  Despite being incorporated in Virginia, Virginia True claimed Brooklyn, New York, to be its principal place of business.  In its bankruptcy filings, Virginia True described itself as a single-asset real estate company.  These bankruptcy proceedings remain pending and include an adversary proceeding between Virginia True and the Cipollones, Adv. Proceeding No. 1-19-01118-nhl.

**The Applestein Suit**

38.     The Applestein Suit was initially filed in the Southern District of Florida and then subsequently transferred, on motion, to the Eastern District of New York, where the Virginia True

bankruptcy and the Cipollone adversary proceeding are also pending.  The Amended Complaint is the operative pleading.  A true and correct copy of the Applestein Suit's Amended Complaint, with its exhibits, is attached hereto as Exhibit 1.

39.     Among the essential allegations of the Amended Complaint are the following:

a.   Applestein was born in 1932 and is a Harvard Law School graduate, although he practiced law only briefly before going into business and becoming a successful investor.  *See* Amended Complaint ¶ 1.

b.   Applestein bought the Fones Cliffs Land in 1958.  *Id.*

c.   Applestein engaged Kleinhendler and the Firm in 2010.  He and Diatomite claim that, "[d]espite starting out with a limited-scope engagement, Defendants continued rendering services as [Applestein's] attorney from 2010 until the spring of 2019."  *See id.* ¶ 9.[2]

d.   In 2013, Applestein decided to sell the Fones Cliffs Land and, he allegedly "sought the legal advice of his trusted attorneys Kleinhendler and the Wachtel Firm to handle the transaction and represent him in connection with this effort."  *See id.* ¶ 11.

e.   Applestein and Diatomite allege that Kleinhendler held himself out as a partner in the Firm, and used his Firm email address and signature block on his emails when communicating with Applestein, thus creating "actual and apparent agency."  *See id.* ¶¶ 22-23.

f.   Several potential deals to sell the Fones Cliffs Land allegedly fell through for various reasons.  *Id.* ¶ 11.

---

[2] As noted in paragraph 12, *supra*, the actual first engagement of Wachtel Masyr, the Firm's predecessor, appears to have occurred in 2009, not 2010.

g.  By 2015, Applestein's health allegedly was in decline.  He had round-the-clock care and was eventually diagnosed with Alzheimer's disease. Kleinhendler allegedly saw Applestein's compromised state as an opportunity.  *See id.* ¶ 12.

h.  First, Kleinhendler allegedly convinced Applestein to pursue rezoning of the Fones Cliffs Land so that it could be developed as an elaborate mixed-use project that would include, among other things, townhomes, a golf course, and a hotel.  *See id.* ¶ 15.

i.  Eventually, Kleinhendler allegedly made a pitch to Applestein that called for Applestein to sell the Fones Cliffs Land to Kleinhendler, who would then develop it.  Applestein and Diatomite allege that Kleinhendler said nothing about any conflict of interest this would involve.  *See id.* ¶ 16.

j.  In 2017, Kleinhendler organized Virginia True to acquire the Fones Cliffs Land, allegedly preparing all the documentation, "all the while continuing to represent Applestein."  *See id.* ¶ 17.

k.  Kleinhendler allegedly resisted or deflected questions about whether Applestein should have a lien against the property in order to secure the note from Virginia True that would be part of the seller-financed transaction.  *See id.* ¶¶ 29-30.

l.  Kleinhendler, as previously described, also persuaded Applestein to make a loan of $500,000 – without security or any guarantee – to Kleinhendler's company, HK Consulting.  *See id.* ¶ 33.

m. As previously described, simultaneous with the closing of the Diatomite/Virginia True deal, Kleinhendler was closing a transaction with the Cipollones by which they would buy into Virginia True for $5 million, and retain the right to convert their equity into secured debt. *See id.* ¶ 35.

n. The transaction with the Cipollones allegedly violated assurances that Kleinhendler had given to Applestein in the Side Letter Agreement (described previously), to the effect that the Fones Cliffs Land would not be encumbered without Applestein's prior written consent. *See id.* ¶¶ 31, 34-35.

o. As previously described, the Cipollones did in fact convert their equity to debt, and did receive a note for $5 million and a deed of trust. *See id.* ¶ 39.

40. Attached to the Amended Complaint are a number of exhibits, which include the following:

a. The "Affidavit of Robert C. Smith," the previously mentioned Richmond, Virginia attorney who had been engaged by Diatomite in 2014 to assist in obtaining rezoning of the Fones Cliffs Land. Smith states, among other things, that "[j]ust prior to closing [of the Diatomite/Virginia True transaction], I learned that Kleinhendler had become a director and officer of Diatomite, and he was also a director and officer of Virginia True." *See id.* at Exhibit A.

b. The "Stockholders' Agreement" between and among Virginia True, Kleinhendler, Fernandez, and the Cipollones. *See id.*, Exhibit C.

    c.   The "Deed of Trust" from Virginia True to a trustee for the benefit of the Cipollones, securing Virginia True's note in the amount of $5 million, signed by Kleinhendler as "Executive Vice President" of Virginia True. *See id.*, Exhibit D.

41.    The Amended Complaint sets forth four causes of action against both Kleinhendler and the Firm, including:

    a.   "Count One – Legal Malpractice," under which both Diatomite and Applestein seek compensatory damages of at least $7,724,200.36;[3]

    b.   "Count Two – Breach of Fiduciary Duty," under which both Diatomite and Applestein seek the same compensatory damages as in Count One, but also assert an entitlement to punitive damages based on the Defendants' "oppressive, fraudulent and malicious" acts;

    c.   "Count Three – Elder Abuse," under which Applestein ( but not Diatomite) alleges that both Defendants violated Florida statutes concerning elder abuse, and seeks the same compensatory damages alleged in the previous Counts, as well as punitive damages; and

    d.   "Count Four – Fraud," under which Diatomite and Applestein allege that both Kleinhendler and the Firm engaged in fraud in connection with the Fones Cliffs Land transactions, and again seek compensatory damages in the amount previously alleged, as well as punitive damages.

---

[3] Although not alleged in the Amended Complaint, this figure is effectively the sum of the principal and then-accrued interest due on the $7 million unsecured promissory note from Virginia True to Diatomite in connection with Virginia True's purchase of the Fones Cliffs Land, plus the $500,000 loan to HK Consulting.

42.     The Applestein Suit closes with a prayer for relief that includes requests for compensatory damages in excess of $7,724,200.36, punitive damages, "restitution for the Kleinhendler Loan" (i.e., the loan to HK Consulting), imposition of a constructive trust, costs of suit, and such other and further relief as the court deems appropriate.

43.     Associated, subject to a full and complete reservation of all rights under the Policy, has undertaken to fund the defense of both the Firm and Kleinhendler in the Applestein Suit through independent counsel of their choosing.

### The Firm's and Kleinhendler's Responses to the Applestein Suit

44.     Kleinhendler recently filed an "Answer and Affirmative Defenses to Amended Complaint and Third-Party Complaint" (the "Kleinhendler Third Party Complaint"), a true and correct copy of which is attached hereto as Exhibit 11.   The Kleinhendler Third Party Complaint names as defendants Marian Hasty, Gautier & Hasty, P.L., Steven Dohan, and Dohan CPA PA,[4] and alleges the following:

    a.      "At all times in 2017, Kleinhendler was acting as Executive Vice President for Virginia True Corporation, and is entitled to indemnification from Virginia True." *See* Ex. 11, at Affirmative Defenses ¶ 9.

    b.      Kleinhendler "was not acting as Applestein or Diatomite's attorney in 2017 when Diatomite sold the Fones Cliffs Land to Virginia True." *Id.* ¶ 10.

    c.      Apart from three discrete engagements where Applestein retained Kleinhendler and the Firm's predecessor in and around 2009 and 2010, "Applestein recognized that Kleinhendler's abilities extended beyond legal

---

[4] The Kleinhendler Third Party Complaint alleges that these defendants were Applestein's advisors in connection with Diatomite's sale of the Fones Cliffs Land to Virginia True.  *See* Ex. 11 at Third Party Complaint ¶¶ 21-22, 24-33.

representation, including real estate development and sales." *Id.* at Third Party Complaint ¶ 15.

d. In 2010, Applestein hired "Kleinhendler, but not [the Firm], in a consulting capacity" in connection with developing property in Haiti and the sale of a warehouse in Tulsa, Oklahoma. *Id.*

e. In 2011, Applestein, on behalf of Diatomite, "hired Kleinhendler, but not [the Firm], to attempt to sell Diatomite's property located in Richmond County, Virginia (the **'Fones Cliffs Property'**)." *Id.* ¶ 16 (emphasis in original).

f. In March 2016, Kleinhendler told Applestein that he "was putting together a group of investors that were interested in purchasing and developing the Fones Cliffs Property." *Id.* ¶ 19.

g. When the structure of the transaction changed from a stock sale to an asset purchase, Kleinhendler discussed the changes with Applestein "on behalf of Virginia True." *Id.* ¶ 24.

h. Kleinhendler attended the April 27, 2017 closing of the Diatomite/Virginia True transaction "on behalf of Virginia True in his capacity as Virginia True's Executive Vice President." *Id.* ¶ 33.

45. The Firm filed a separate "Answer to the Amended Complaint" (the "Firm's Answer"). A true and correct copy of the Firm's Answer, dated March 24, 2021, is attached hereto as Exhibit 12. The Firm's Answer repeatedly and consistently denies that it had any involvement with the Fones Cliffs Land transaction or matters involving Diatomite. The Firm's Answer further

denies that Kleinhendler was acting as Applestein's or Diatomite's attorney in connection with that transaction, and indeed disavows any knowledge of the transaction.

46.   More specifically, the Firm's Answer alleges the following:

a.   The Firm "denies it approved, ratified, or knew of the acts of Kleinhendler as they are alleged in the Amended Complaint – to the extent such acts even occurred." *See* Ex. 12, ¶ 4.

b.   The Firm asserts that "Plaintiffs engaged a predecessor to Wachtel Missry in 2010 and did pay that predecessor firm approximately $100,000.  No other legal fees were paid to the predecessor firm or to Wachtel Missry LLP." *Id.* ¶ 9.

c.   The Firm asserts that "Mr. Kleinhendler was not acting as Allan Applestein's attorney during the subject time period as it related to the Fones Cliffs Land." *Id.* ¶ 16.  *See also id.* ¶¶ 22, 23, 28 (each asserting that "Mr. Kleinhendler did not represent Allan Applestein in the sale of the Fones Cliffs Land to Virginia True."); *id.* ¶¶ 25-26 (asserting that "Howard Kleinhendler was not Allan Applestein's attorney at the time of the Fones Cliffs transaction . . . ."); *id.* ¶¶ 29-31 (each asserting that "Mr. Kleinhendler did not represent Allan Applestein in the subject transaction."); *id.* ¶ 33 (alleging that the Firm and Kleinhendler "did not represent Allan Applestein in connection with the subject loan," referring to the $500,000 loan to HK Consulting); *id.* ¶ 35 (referring to Virginia True's Stockholders' Agreement with the Cipollones, and asserting that "[t]he Defendant did not represent

Allan Applestein in this transaction" and that "the record in the case is clear – Mr. Kleinhendler did not represent Allan Applestein in this transaction.").

d.     The Firm "has no firsthand knowledge of what Mr. Kleinhendler did or did not do or advise during his business relationship with the Cipollones." *Id.* ¶ 38.

e.     The Firm "denies there was an attorney-client relationship between it and the Plaintiffs during the time period relevant to the Amended Complaint." *Id.* ¶ 43. *See also id.* ¶¶ 44-46 (each alleging that "Howard Kleinhendler did not represent Allan Applestein in the Fones Cliffs Land transaction").

f.     The Firm "did not solicit Plaintiffs nor did [the Firm] have any knowledge of Mr. Kleinhendler's interest in the Fones Cliffs Land." *Id.* ¶ 48; *id.* at Eighth Affirmative Defenses ("Defendant Wachtel Missry LLP [the Firm] was not involved in the underlying transaction as it did not represent either the seller or the buyer and had no intention of affecting the outcome of the transaction one way or the other.").

**THE POLICY**

47.     The Policy was issued by Associated Industries Insurance Company, Inc. ("Associated"), and is the first policy Associated or any of its affiliates ever issued to the Firm. A true and correct copy of the Policy is attached hereto as Exhibit 13.

48.     The Policy was effective for the Policy Period[5] from October 19, 2018 to October 19, 2019. It is subject to a limit of liability of $5,000,000 per claim, $5,000,000 aggregate, with a self-insured retention of $100,000 per claim. *See* Ex. 13, Policy, Declarations.

---

[5] Capitalized terms and terms appearing in **bold font** not otherwise defined here are defined in the Policy.

49.     Among the Policy's pertinent provisions are the following:

a.      The Policy's Insuring Agreement A requires, with respect to Associated's duty to indemnify, that there be, *inter alia*, a "**Claim**" for a "**Wrongful Act**." *Id*., Insuring Agreements, A.

b.      The Policy's Insuring Agreement A further provides that the Policy applies only to Claims for Wrongful Acts that are timely made and reported, "provided that . . . the **Insured** has no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy." *Id.*

c.      "**Wrongful Act**" is defined as "any actual or alleged negligent act, error, or omission committed or attempted in the rendering or failing to render **Professional Services** by any **Insured** on behalf of the **Named Insured** . . . ." *Id.*, Definitions, BB.

d.      "**Insured**" is defined, in pertinent part, as including the Firm, as the **Named Insured**, and "any individual . . . who was a partner . . . of the **Named Insured**, but solely while acting within the scope of their duties as such on behalf of the **Named Insured**." *Id.*, Definition, J, 1, 3.

e.      "**Professional Services**" are defined as services "provided by any **Insured** to others as a lawyer . . . but solely services on behalf of the **Named Insured** . . . ." *Id.*, Definitions, V.

f.      Exclusion I precludes coverage for "any **Damages** or **Claims Expenses** incurred with respect to any **Claim** . . . based upon or arising out of any actual or alleged activities of an **Insured** as, or an **Insured** acting in, the

18

capacity as . . . an officer, director, [or] partner . . . of a . . . corporation or business enterprise, other than the **Named Insured.**" *Id.,* Exclusions, I.

g.    Exclusion C, as amended by endorsement, excludes claims "based upon, arising out of, or attributable to any written demand, litigation, proceeding, administrative action or hearing known to or reasonably foreseen by any Insured prior to or pending as of the Prior and Pending Litigation Date [October 19, 2018] as stated in the Declarations." *Id.,* Exclusions, C (as amended by the "Modified Prior & Pending Litigation Exclusion" Endorsement).

h.    The Policy's Insuring Agreement C provides, in pertinent part, that Associated "shall have the right and duty to defend any **Claim** against the **Insured** to which this Policy applies . . . ." *Id.*, Insuring Agreements, C.

**FIRST CLAIM FOR RELIEF:  FOR DECLARATORY JUDGMENT OF NON-COVERAGE FOR THE FIRM OR KLEINHENDLER BECAUSE THE APPLESTEIN SUIT DOES NOT INVOLVE "PROFESSIONAL SERVICES" PROVIDED BY THE FIRM OR KLEINHENDLER**

50.    Associated re-alleges and incorporates by reference the allegations in Paragraphs 1 through 49 as if fully set forth herein.

51.    The Policy defines a potentially covered Wrongful Act as "any actual or alleged negligent act, error, or omission committed or attempted in the rendering or failing to render **Professional Services** by any **Insured** on behalf of the **Named Insured** . . . ."

52.    Professional Services are defined as those services "provided by any **Insured** to others as a lawyer . . . but solely services on behalf of the **Named Insured** . . . ."

53.    Both the Firm and Kleinhendler admit that Kleinhendler's activities with Applestein with respect to Diatomite, the Fones Cliffs Land, Virginia True, and the loan to HK

Consulting were personal to Kleinhendler. The Firm and Kleindendler assert that these were business activities undertaken by Kleinhendler for his own account, not services provided by Kleinhendler or the Firm as lawyers for Applestein, Diatomite, or indeed for anyone.

54. Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend the Firm and/or Kleinhendler because the Applestein Suit does not involve Professional Services provided by the Firm or Kleinhendler and therefore is not a Claim for a Wrongful Act within the scope of the Policy's Insuring Agreement.

**SECOND CLAIM FOR RELIEF: FOR DECLARATORY JUDGMENT OF NON-COVERAGE FOR KLEINHENDLER BECAUSE HE IS NOT AN "INSURED" WITH RESPECT TO THE ACTIVITIES AT ISSUE IN THE APPLESTEIN SUIT**

55. Associated re-alleges and incorporates by reference the allegations in Paragraphs 1 through 54 as if fully set forth herein.

56. The Policy defines Insured to include "any individual . . . who was a partner . . . of the **Named Insured**, but solely while acting within the scope of their duties as such on behalf of the **Named Insured**."

57. None of the activities of Kleinhendler that are at issue in the Applestein Suit were undertaken by him "solely while acting within the scope of [his] duties . . . on behalf of" the Firm. Both the Firm and Kleinhendler admit that Kleinhendler's activities with Applestein with respect to Diatomite, the Fones Cliffs Land, Virginia True, and the loan to HK Consulting were personal to Kleinhendler. The Firm and Kleindendler assert that these were business activities undertaken by Kleinhendler for his own account, not services provided by Kleinhendler or the Firm as lawyers for Applestein, Diatomite, or indeed for anyone.

58. Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend Kleinhendler because he is not an Insured with respect to the activities that are the subject of the Applestein Suit.

## THIRD CLAIM FOR RELIEF:  FOR DECLARATORY JUDGMENT THAT COVERAGE FOR THE FIRM AND KLEINHENDLER IS IN ANY EVENT PRECLUDED BY OPERATION OF THE POLICY'S EXCLUSION I

59.     Associated re-alleges and incorporates by reference the allegations in Paragraphs 1 through 58 as if fully set forth herein.

60.     Even assuming, *arguendo*, that the Applestein Suit were deemed to involve Professional Services and thus to constitute a Claim for Wrongful Acts as required by the Policy's Insuring Agreements, and even assuming further that Kleinhendler were to be deemed an "Insured" with respect to the activities at issue in the Applestein Suit, coverage and any duty to defend are still precluded by operation of the Policy's Exclusion I, which bars coverage "any **Damages** or **Claims Expenses** incurred with respect to any **Claim** . . . based upon or arising out of any actual or alleged activities of an **Insured** as, or an **Insured** acting in, the capacity as . . . an officer, director, [or] partner . . . of a . . . corporation or business enterprise, other than the **Named Insured.**"

61.     The gravamen of the Applestein Suit concerns Kleinhendler's actions in arranging the sale of the Fones Cliffs Land to Virginia True, and, later, in granting to the Cipollones a secured debtor position, superior to that of Diatomite, by Virginia True's issuance of a note for $5 million that was secured by a deed of trust.

62.     Kleinhendler by his own admission was the Executive Vice President (and, according to at least one exhibit, also the Secretary) of Virginia True, he asserts that he attended the closing of the transaction as Executive Vice President of Virginia True, and he executed both the Cipollones Note and Deed of Trust in his capacity as Executive Vice President of Virginia True.

63.     In addition, the Applestein Suit includes an assertion and a claim for damages relating to Applestein's unsecured loan of $500,000 to HK Consulting, a limited liability company

in which Kleinhendler was, on information and belief, the sole member and which is not an Insured under the Policy.

64.     Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend the Firm and/or Kleinhendler because the Applestein Suit is a claim based upon or arising out of the actual or alleged activities of Kleinhendler as an officer or partner of a corporation (Virginia True) or business enterprise (HK Consulting) other than the Firm, and coverage for both Kleinhendler and the Firm, including any obligation to defend, is therefore barred by operation of Exclusion I.

### FOURTH CLAIM FOR RELIEF:  FOR DECLARATORY JUDGMENT THAT COVERAGE FOR THE FIRM AND KLEINHENDLER IS PRECLUDED BY KLEINHENDLER'S PRIOR KNOWLEDGE OF THE WRONGFUL ACTS ALLEGED IN THE APPLESTEIN SUIT

65.     Associated re-alleges and incorporates by reference the allegations in Paragraphs 1 through 64 as if fully set forth herein.

66.     The Policy's Insuring Agreement provides that the Policy applies only to Claims for Wrongful Acts that are timely made and reported, "provided that . . . the **Insured** has no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy."  The Policy's Inception Date is October 19, 2018.

67.     Kleinhendler had full knowledge of all of his acts and transactions vis–a-vis Diatomite, Applestein, and the Fones Cliffs Land prior to the Policy's Inception Date of October 19, 2018.  These acts and transactions include: (i) the April 2017 sale of the Fones Cliffs Land from Diatomite to Virginia True; (ii) the contemporaneous transaction with the Cipollones that, in contravention of the Side Letter Agreement with Applestein, gave the Cipollones the right to encumber the Fones Cliffs Land; (iii) the contemporaneous $500,000 loan to HK Consulting;  and (iv) the Cipollones' invocation of the buy-out option of the Stockholders' Agreement on

September 28, 2018, which Kleinhendler knew – given Virginia True's lack of funds and inability to buy out the Cipollones – would necessarily result in the granting of a secured interest in the Fones Cliffs Land to the prejudice of Applestein.

68.     Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend the Firm and/or Kleinhendler because it is not within the scope of the Policy's Insuring Agreement due to Kleinhendler's knowledge prior to the Inception Date of the Policy of Wrongful Acts giving rise to the Applestein Suit.

### FIFTH CLAIM FOR RELIEF:  FOR DECLARATORY JUDGMENT THAT COVERAGE FOR THE FIRM AND KLEINHENDLER IS PRECLUDED BY OPERATION OF THE POLICY'S PRIOR AND PENDING LITIGATION EXCLUSION

69.     Associated re-alleges and incorporates by reference the allegations in Paragraphs 1 through 68 as if fully set forth herein.

70.     The Policy's Exclusion C, as amended by endorsement, excludes claims "based upon, arising out of, or attributable to any written demand, litigation, proceeding, administrative action or hearing known to or reasonably foreseen by any **Insured** prior to or pending as of the Prior and Pending Litigation Date [October 19, 2018] as stated in the Declarations."

71.     Kleinhendler, as of October 19, 2018, not only had full knowledge of all of his acts and transactions vis–a-vis Diatomite, Applestein, and the Fones Cliffs Land, but also knew or reasonably should have foreseen that claims against him by Applestein and/or Diatomite would result.  Prior to October 19, 2018, Kleinhendler knew of: (i) the April 2017 sale of the Fones Cliffs Land from Diatomite to Virginia True; (ii) the contemporaneous transaction with the Cipollones that, in contravention of the Side Letter Agreement with Applestein, gave the Cipollones the right to encumber the Fones Cliffs Land; (iii) the contemporaneous $500,000 loan to HK Consulting, which apparently remains unpaid to this day, and (iv) the Cipollones' invocation of the buy-out option of the Stockholders' Agreement on September 28, 2018, which– given Virginia True's lack

of funds and inability to buy out the Cipollones – would necessarily result in the granting of a secured interest in the Fones Cliffs Land to the prejudice of Applestein.  Kleinhendler also knew that the Virginia Attorney General had filed suit against Virginia True for environmental violations and that, for this and many other reasons, the entire Fones Cliffs project was doomed.

72.    Under these circumstances, as of October 19, 2018, Kleinhendler must have known, or at minimum reasonably should have foreseen, that Applestein and/or Diatomite would assert the types of claims that are now asserted in the Applestein Suit.

73.    Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend the Firm and/or Kleinhendler because Kleinhendler knew or reasonably expected, as of October 19, 2018, that Claims of the sort now at issue in the Applestein Suit would be pursued.

**WHEREFORE**, Plaintiff Associated respectfully requests that this Court enter judgment in favor of Associated and against the Defendants as follows:

a.  For the First Claim for Relief, declaring that the Policy does not provide coverage for, or require Associated to defend, the Firm or Kleinhendler because the Applestein Suit does not involve "Professional Services" provided by the Firm or Kleinhendler;

b.  For the Second Claim for Relief, declaring that the Policy does not provide coverage for, or require Associated to defend, Kleinhendler because he is not an "Insured" with respect to the activities at issue in the Applestein Suit;

c.  For the Third Claim for Relief, declaring that the Policy does not provide coverage for, or require Associated to defend, the Firm or Kleinhendler by operation of the Policy's Exclusion I;

d.  For the Fourth Claim for Relief, declaring that the Policy does not provide coverage for, or require Associated to defend, the Firm or Kleinhendler due to Kleinhendler's knowledge, prior to October 19, 2018, of the activities and transactions at issue in the Applestein Suit such that the Applestein Suit is not within the scope of the Policy's Insuring Agreements;

e.  For the Fifth Claim for Relief, declaring that the Policy does not provide coverage for, or require Associated to defend, the Firm or Kleinhendler due to Kleinhendler

knowledge or reasonable expectation, as of October 19, 2018, of the possibility that Claims of the sort at issue in the Applestein Suit would be asserted;

f.   Awarding Associated its costs and attorneys' fees; and

g.   Granting such other and further relief as this Court deems just, fitting, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 23, 2021                    Respectfully submitted,


                                         ___/s/_____
                                         Kim Hoyt Sperduto
                                         S.D.N.Y. Bar No. KS5048
                                         SPERDUTO THOMPSON & GASSLER PLC
                                         1747 Pennsylvania Avenue, N.W.
                                         Suite 1250
                                         Washington, DC 20006
                                         202-408-8900 (tel)
                                         202-408-8910 (fax)
                                         ksperduto@stglawdc.com


Of Counsel:

Peter G. Thompson (*pro hac vice forthcoming*)
April H. Gassler (*pro hac vice forthcoming*)
SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Avenue, N.W.
Suite 1250
Washington, DC 20006
202-408-8900 (tel)
202-408-8910 (fax)
pthompson@stglawdc.com
agassler@stglawdc.com