# EXHIBIT 13

# COMMERCIAL LINES POLICY



# Associated Industries Insurance Company, Inc.

Associated Industries Insurance Company, Inc.

P.O. Box 318004
Cleveland, OH 44131-0880

THIS POLICY CONSISTS OF:

– DECLARATIONS
– COMMON POLICY CONDITIONS
– COVERAGE FORMS
  APPLICABLE ENDORSEMENTS

AES JACKET 08 11

Associated Industries Insurance Company, Inc.

In Witness Whereof, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

President

Elissa Pacheco

AES JACKET 08 11

Associated Industries Insurance Company, Inc.
Administered through:

**Policy Number:** AES1058242 01

AmTrust E&S Insurance Services
160 Federal Street, 3rd Floor
Boston, MA  02110

**Named Insured:** Wachtel Missry LLP

## LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY DECLARATIONS

| **Renewal of:** | N/A | **Policy Period:** | **From** | 10/19/2018 | **To** | 10/19/2019 |
|---|---|---|---|---|---|---|

| **Retroactive Date:** | Full Prior Acts | **Prior and Pending Litigation Date:** | 10/19/2018 |
|---|---|---|---|

| Named Insured and Address | Broker Name and Address |
|---|---|
| Wachtel Missry LLP<br>One Dag Hammarskjold Plaza<br>885 Second Avenue<br>New York, NY 10017 | Christine Diaz<br>480 Norristown Road<br>Blue Bell, PA 19422 |

**Professional Services Covered by this Policy:**     Per Policy Form

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| | | |
|---|---|---:|
| **LIMITS OF INSURANCE** | | |
| Each Claim | $ | 5,000,000 |
| Policy Period Aggregate | $ | 5,000,000 |
| **DISCIPLINARY PROCEEDING COVERAGE** | | |
| Each Disciplinary Hearing | $ | 25,000 |
| Policy Period Aggregate | $ | 100,000 |
| **NETWORK SECURITY AND PRIVACY COVERAGE** | | |
| Each Claim | $ | 1,000,000 |
| Policy Period Aggregate | $ | 1,000,000 |
| **RETENTION** | | **SELF-INSURED RETENTION** |
| Each Claim | $ | 100,000 |
| Policy Period Aggregate | $ | None |
| **MAXIMUM LIMIT** | | |
| Each Claim | $ | 5,000,000 |
| Policy Period Aggregate | $ | 5,000,000 |

**TOTAL PREMIUM FOR THIS COVERAGE**     $          150,225.00

Earned Minimum Premium shall be 25 percent of the Total Premium

| Forms and Endorsements Applicable |
|---|
| See Forms and Endorsements Schedule |

**THIS IS A CLAIMS MADE AND REPORTED POLICY, EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.  PLEASE READ THE POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EPXENSES, UNLESS THE POLICY IS OTHERWISE ENDORSED.  AMOUNTS INCURRED FOR CLAIM EXPENSES AND DAMAGES SHALL ALSO BE APLIED AGAINST THE SELF-INSURED RETENTION, UNLESS THE POLICY IS OTHERWISE ENDORSED.**

**TERMS THAT APPEAR IN BOLD TYPE, OTHER THAN THE CAPTION TITLES, HAVE SPECIAL MEANING.
PLEASE REFER TO SECTION II. DEFINITIONS.**

These Declarations, the completed and signed **Application**, and this policy with endorsements shall constitute the full and complete contract between the Insured and the Company as of the effective date unless and until otherwise endorsed.

Issued Date:          10/23/2018

AESDEC PL 120 0114

This page intentionally left blank

Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

**Policy Number:**
AES1058242 01

**Named Insured:**
Wachtel Missry LLP

## COMMON POLICY DECLARATIONS

| Policy Number | AES1058242 01 | Policy Period: | From | 10/19/2018 | To | 10/19/2019 |
|---|---|---|---|---|---|---|

12:01 a.m. Standard Time at the Named Insured's Address

| Transaction | New Business |
|---|---|

| Named Insured and Address | Broker |
|---|---|
| Wachtel Missry LLP | Program Brokerage Group (PROF) |
| One Dag Hammarskjold Plaza | 480 Norristown Road |
| 885 Second Avenue | Blue Bell PA 19422 |
| New York NY 10017 | |

| Business Description | Type of Business | Audit Period |
|---|---|---|
| Law Firm | Partnership | |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.  This policy consists of the following coverage parts for which a premium is indicated.  This premium may be subject to adjustment.

| COVERAGE PART DESCRIPTION | PREMIUM |
|---|---|

| | | |
|---|---|---|
| POLICY PREMIUM | $ | 150,000.00 |
| DEPOSIT PREMIUM | $ | 150,000.00 |
| POLICY FEE | $ | 225.00 |
| TOTAL DEPOSIT PREMIUM | $ | 150,225.00 |

| Minimum Retained Audit Premium | $ 37,556.25 | Minimum Retained Premium | $ 37,556.25 |
|---|---|---|---|

| Forms applicable to all Coverage Parts: | See Forms and Endorsements schedule |
|---|---|

Countersigned this _____ By _____

                                                    Authorized Representative

Issued Date:        10/23/2018

INSURED COPY

CPPMDEC 0411

This page intentionally left blank

Associated Industries Insurance Company, Inc.
Administered through: AmTrust E & S Insurance Services, Inc.
160 Federal Street, 3rd Floor
Boston, MA 02109

**Policy Number:**
AES1058242 01
**Named Insured:**
Wachtel Missry LLP

## FORMS AND ENDORSEMENTS SCHEDULE

| Coverage | Form | Ed. Date | Description |
|----------|------|----------|-------------|
| PROF | AESPL005 | (01/14) | LAWYERS' PROFESSIONAL LIABILITY INSURANCE POLICY |
| PROF | AESPL014 | (01/14) | POLICYHOLDERS GUIDE TO REPORTING A PROFESSIONAL LIABILITY CLAIM |
| PROF | AESPL017 | (01/14) | TOTAL TERRORISM EXCLUSION |
| PROF | AESPL031 | (01/14) | NUCLEAR ENERGY LIABILITY EXCLUSION |
| PROF | AESPL043 | (01/14) | SPECIFIC CLAIM EXCLUSION |
| PROF | AESPL050 | (01/14) | MINIMUM RETAINED PREMIUM ENDORSEMENT |
| PROF | AESPL067 | (01/14) | COVERAGE ENHANCEMENTS FOR PREFERRED RISKS LAWYERS |
| PROF | AESPL088 | (01/14) | OPTIONAL EXTENDED REPORTING PERIOD AMENDMENT |
| PROF | AESPL134 | (10/15) | MODIFIED CANCELLATION PROVISION – NONPAYMENT OF PREMIUM ONLY |
| PROF | AESPL138 | (10/15) | COVERAGE FOR PREDECESSOR FIRMS |
| PROF | AESPL145 | (08/16) | MODIFIED PRIOR & PENDING EXCLUSION |
| PROF | AESPL99034 | (09/14) | IDENTITY RECOVERY COVERAGE |
| PROF | AESPN | (08/11) | ASSOCIATED INDUSTRIES INSURANCE COMPANY PRIVACY POLICY |

CPPMFORMSCHED

This page intentionally left blank

# Service of Suit

Service of process for any suit instituted against the Company concerning this Policy may be made upon the Superintendent, Commissioner, or Director of Insurance or other person specified for that purpose in the statute or his/her successor or successors in office as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder and arising out of this Policy.

The Company hereby designates:

> Corporation Service Company
> 80 State Street
> Albany, NY 12207-2543

as the person(s)/organization to whom the Superintendent, Commissioner, or Director of Insurance or other specified person is authorized to mail such process or a true copy thereof, in compliance with the applicable statutes governing said service of process in the state or jurisdiction in which a cause of action under this Policy                                                                                                 arises.

Associated Industries Insurance Company

This page intentionally left blank

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

This page intentionally left blank



AmTrust E&S Insurance Services
An AmTrust Financial Company

# LAWYERS' PROFESSIONAL LIABILITY INSURANCE POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY**

**THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY IN ACCORDANCE WITH THE TERMS OF THIS POLICY.  CLAIM EXPENSES REDUCE THE LIMIT OF LIABILITY.  PLEASE REVIEW THIS POLICY CAREFULLY.**

_____

In consideration of the payment of the premium, and the undertaking of the **Insured** to pay the Retention herein, and in reliance upon all statements made and information contained in the **Application**, which is attached hereto and made a part hereof, and subject to the Declarations, limitations, conditions, provisions and other terms of this Policy, the **Company** and the **Insured** agree as follows:

**I.   INSURING AGREEMENTS**

    A.  The **Company** shall pay **Damages** and **Claim Expenses,** in excess of the Self-Insured Retention identified in the Declarations, if applicable, and subject to the Policy's Limit of Liability, that the **Insured** shall become legally obligated to pay as a result of a **Claim** made against the **Insured** for a **Wrongful Act**, provided that (i) the **Claim** is first made against the **Insured** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Insured** has no knowledge of such **Wrongful Act** prior to the Inception Date of this Policy; and (iii) such **Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**.

    B.  If Each Claim and Policy Period Aggregate limits have been purchased for Network Security and Privacy coverage as designated in the Declarations, the **Company** shall pay **Damages** and **Claims Expenses** resulting from any **Claim** first made against the **Insured** for a **Network Security Wrongful Act** or **Privacy Wrongful Act**, provided that (i) the **Claim** is first made against the **Insured** and reported to the Company, in writing, during the **Policy Period** or the Extended Reporting Period, if applicable; (ii) the **Insured** has no knowledge of such **Network Security Wrongful Act** or **Privacy Wrongful Act p**rior to the Inception Date of this Policy; and (iii) such **Network Security Wrongful Act** or **Privacy Wrongful Act** took place on or after the **Retroactive Date** set forth in the Declarations Page of this Policy and prior to the end of the **Policy Period**.

    **C.   Defense.**  As part of and subject to the Policy's Limit of Liability, the **Company** shall have the right and duty to defend any **Claim** against the **Insured** to which this Policy applies, even if the allegations of the **Claim** are groundless, false, or fraudulent.  However, the **Company's** duty to defend shall terminate upon exhaustion of the applicable Limit of Liability by the payment of **Damages** and/or **Claim Expenses.**

    D.  **Settlement of Claims.** The **Company** shall have the right to make such investigation, negotiation or settlement of a covered **Claim** that it deems expedient; provided, however, that the **Company** shall not settle any **Claim** without the consent of the **Insured**, which shall not be unreasonably withheld.  If the **Company** recommends a settlement and the **Insured** refuses to give written consent to such settlement as recommended by the **Company**, then the **Company's** liability shall not exceed the amount which the **Company** would have paid for **Damages** and **Claim Expenses** at the time the **Claim** could have been settled or compromised.

E. **Disciplinary Proceedings.**  The **Company** will reimburse the **Insured** for reasonable attorney fees, costs and expenses resulting from the investigation or defense of each **Disciplinary Proceeding** incurred as a result of a notice of proceeding both first received by the **Insured** and reported in writing to the **Company** during the **Policy Period**, and arising out of a covered **Wrongful Act**.  The maximum amount payable by the **Company** hereunder shall not exceed $25,000 for each **Disciplinary Proceeding**, subject to a maximum aggregate of $100,000 regardless of the number of **Insureds** or the number of **Disciplinary Proceedings**.  The amount payable under this Insuring Agreement is in addition to the Limit of Liability set forth in the Declarations and the Retention is not applicable to such amount.

## II.  DEFINITIONS

Wherever used in this Policy:

A. **"Application"** means all signed applications, including attachments and other materials submitted therewith or incorporated therein, submitted by the **Insured** to the **Company** for this Policy or for any policy of which this Policy is a direct or indirect renewal or replacement.  **"Application"** shall also include all documents provided by the **Insured** to the **Company** in connection with the underwriting or issuance of this Policy and any information contained on the website(s) of the **Insured**, whether provided to the **Company** directly or indirectly through the use of public databases or similar sources. All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

B. **"Bodily Injury"** means physical injury, sickness or disease sustained by a person, including death resulting from an of these at any time.  **"Bodily Injury"** includes emotional distress, or mental anguish whether or not accompanied by physical injury, sickness or disease.

C. **"Claim"** means a written demand received by the **Insured** for monetary **Damages** which alleges a **Wrongful Act**, including:

1.  the service of suit or any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment, or similar proceeding;

2.  institution of arbitration, mediation or other formal alternative dispute resolution proceeding;

3.  any written request to toll or waive a statute of limitations.

A **Claim** for injunctive relief alleging any **Wrongful Act** for which insurance would have been granted under this Policy if **Damages** had been sought, will be considered a **Claim** for the purposes of this Policy, but only the **Claim Expenses** arising therefrom will be covered by this Policy**.**

D. **"Claim Expenses"** means:

1.  reasonable and necessary fees charged by an attorney designated by the **Company**;

2.  all other reasonable fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the **Company** or by the **Insured** with the written consent of the **Company**.

**"Claim Expenses"** shall not include (i) salary expenses or wages of any employee or officer of the **Company** or any supervisory counsel retained by the **Company;** (ii) salary expenses or wages of the **Insureds**; or (iii) any fees, costs or expenses incurred in connection with any criminal proceedings or actions against an **Insured**.  The determination by the **Company** as to the reasonableness of **Claim Expenses** shall be conclusive on the **Insured**.

E. **"Company"** means the insurer named in the Declarations.

F. **"Computer System"** means computers and associated software, input and output devices, data storage devices, networking equipment and back up facilities.

G. **"Damages"** means any compensatory sum which the **Insured** becomes legally obligated to pay and includes:

1. monetary judgments or settlements;

2. punitive or exemplary damages to the extent such damages are insurable under the law most favorable to the insurability of such damages of any jurisdiction which has a substantial relationship to the **Insured**, the **Company**, this Policy or the **Claim**;

3. pre-judgment and post-judgment interest.

**"Damages"** shall not include:

1. taxes, fines or penalties, sanctions, whether imposed by law or otherwise (except as provided above with respect to punitive or exemplary damages);

2. the return, reduction or restitution of fees, expenses or costs for **Professional Services** performed or to be performed by the **Insured**, or disgorgement by any **Insured**;

3. matters uninsurable under the law pursuant to which this Policy is construed;

4. the cost of correcting, re-performing or completing **Professional Services**;

5. future profits, future royalties, costs of licensing, or other costs of obtaining future use; or the costs to comply with orders granting injunctive relief or non-monetary relief, including specific performance, or any agreement to provide such relief.

H. **"Disciplinary Proceeding"** means a proceeding alleging violation of any disciplinary rule or other professional misconduct before an administrative, regulatory or disciplinary board, or agency with authority to render a determination as to whether such alleged professional misconduct is to be subject to discipline. However, **"Disciplinary Proceeding"** shall not include a criminal proceeding or an Organizational Peer Review.

I. **"Denial of Service Attack"** means a malicious attack by a third party which is designed to slow or completely interrupt access to a targeted **Computer System** or website by other third parties authorized to gain access to that **Computer System** or website.

J. **"Insured"** means:

1. the **Named Insured** and any Predecessor Firm designated in the Declarations;

2. any individual or professional corporation who is or becomes a partner, officer, director, stockholder, per diem attorney, independent contract attorney, or employee of the **Named Insured**, but solely while acting within the scope of their duties as such on behalf of the **Named Insured** in rendering **Professional Services**;

3. any individual or professional corporation who was a partner, officer, director, stockholder, per diem attorney, independent contract attorney, or employee of the **Named Insured**, but solely while acting within the scope of their duties as such on behalf of the **Named Insured** in rendering **Professional Services**;

4. any individual or professional corporation designated "counsel" or "of counsel" to the **Named Insured**, but solely while acting within the scope of their duties as such on behalf of the **Named Insured** for which a fee inures to the **Named Insured**;

5. any individual or professional entity, corporation, or partnership to whose financial assets and liabilities the **Named Insured** becomes the majority successor in interest during the **Policy Period** but only if:

    a.  within 60 days of becoming the majority successor in interest, the **Named Insured** has provided the **Company** with full particulars of such individual, professional entity, corporation, or partnership and the **Company**, which shall not be required to insure such individual, professional entity, corporation, or partnership, has agreed in writing to insure such individual, professional entity, corporation, or partnership; and

    b.  the **Named Insured** has paid the additional premium, if any, charged by the **Company** and has agreed to any amendment of the provisions of this Policy;

6.  the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of death, incapacity, insolvency or bankruptcy, but any such coverage shall apply only with respect to a **Wrongful Act** of such **Insured**;

7.  the lawful spouse or lawful domestic partner of any **Insured**, if named as a co-defendant with such **Insured** solely by reason of such spouse's status as a spouse or such domestic partner's status as a domestic partner, or such spouse's or domestic partner's ownership interest in property that is sought by a claimant as recovery for an alleged **Wrongful Act** of such **Insured**, but any such coverage shall apply only with respect to a **Wrongful Act** of such **Insured**.

All terms and conditions of this Policy including, without limitation, the Retention applicable to **Claims Expenses** and **Damages** incurred by the **Insured**, shall also apply to **Claims Expenses** and **Damages** incurred by the lawful spouse, domestic partner, estate, heirs, executors, administrators, assigns and legal representatives of such **Insured**.

K.  **"Insured's Computer System"** means computers and associated software, input and output devices, data storage devices, networking equipment and back up facilities:

1.  operated by and either owned by or leased to the **Insured**;

2.  operated by a third party service provider and used for the purpose of providing hosted services to the **Insured** or for processing, maintaining, hosting or storing electronic data of the **Insured**, pursuant to a written contract with the **Insured** for such services.

**"Insured's Computer System"** shall also include the websites of the **Insured** and any data, text, sounds, graphics, images or similar matter stored thereon.

L.  **"Interrelated Wrongful Acts"** means **Wrongful Acts** that are causally or logically related and include all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, or event, or which are the same, related or continuous acts, regardless of whether the **Claim** or **Claims** alleging such acts involve the same or different claimants, **Insureds** or legal causes of action.

M.  **"Malicious Code"** means unauthorized, corrupting or harmful software code, including computer viruses, Trojan horses, keystroke loggers, worms and logic bombs.

N.  **"Network Security"** means those activities performed by the **Insured,** or by others for or on behalf of the **Insured,** to protect against **Unauthorized Access** to, **Unauthorized Use** of, or a **Denial of Service Attack** by a third party directed against, or the transmission of **Malicious Code** to, the **Insured's Computer System.**

O.  **"Network Security Wrongful Act"** means any actual or alleged act, error, omission, neglect, or breach of duty by an **Insured** or the **Insured's Service Provider,** which causes a breach of the **Insured's Network Security** that results in:

1.  the theft, alteration, or destruction of electronic data on the **Insured's Computer System**;

2.  the **Unauthorized Access** to or **Unauthorized Use** of the **Insured's Computer System**;

3.  the denial of an authorized user's access to the **Insured's Computer System**, unless the denial of such authorized user's access is caused by a mechanical or electrical failure outside the control of the **Insured**;

4. the participation by the **Insured's Computer System** in a **Denial of Service Attack** directed against a third party's **Computer System**; or

5. the transmission of **Malicious Code** from the **Insured's Computer System** to a third party's **Computer System**.

P. **"Personal Information"** means:

1. an individual's name, social security number, medical or healthcare data, other legally protected health information, drivers license number, state identification number, credit card number(s), debit card number(s), address, telephone number(s), bank or other financial institution account numbers, account histories, or passwords; and

2. other nonpublic personal information, in any format, as defined in **Privacy Regulations**.

**"Personal Information"** shall not include information that is lawfully made available to the general public for any reason, including, but not limited to, information lawfully obtained from federal, state or local government agencies.

Q. **"Personal Injury"** means injury other than **Bodily Injury** arising out of one or more of the following offenses:

1. wrongful entry or eviction, trespass, eavesdropping, false arrest or malicious prosecution;

2. invasion, infringement, interference with the right to privacy or of publicity, including false light, public disclosure of private facts, intrusion or commercial appropriation of name or likeness; or

3. defamation, slander or libel.

R. **"Policy Period"** means the period from the inception date of this Policy to the Policy expiration date stated in the Declarations or its earlier cancellation date, if any.

S. **"Privacy Event"** means:

1. an unauthorized disclosure or loss of:

   a. **Personal Information** in the care, custody or control of any **Insured** or **Service Provider**; or

   b. corporate information in the care, custody or control of any **Insured** or **Service Provider** that is specifically identified as confidential or proprietary and which is protected under a written nondisclosure or other confidentiality agreement or other similar contract; or

2. a violation of any **Privacy Regulation**.

T. **"Privacy Regulation"** means the following statutes and regulations, including any amendments thereto, associated with the control and use of personally identifiable financial, medical or other sensitive information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and Health Information Technology for Economic and Clinical Health Act;

2. Gramm-Leach-Bliley Act of 1999;

3. the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;

4. Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;

5. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged violations of unfair or deceptive acts or practices in or affecting commerce; and

6. other similar state and federal identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

U. "**Privacy Wrongful Act**" means any actual or alleged act, error, omission, neglect or breach of duty by an **Insured** or by a **Service Provider** for services performed for or on behalf of the **Insured** that results in a **Privacy Event**.

V. "**Professional Services**" means services:

1. provided by any **Insured** to others as a lawyer, mediator, arbitrator or notary public but solely for services on behalf of the **Named Insured** or Predecessor Firm designated in the Declarations; or

2. performed by any **Insured** as an administrator, conservator, receiver, executor, guardian, trustee, or in any other fiduciary capacity, but only if the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer and then only to the extent that such services are on behalf of and inure to the benefit of the **Named Insured** or any Predecessor Firm designated in the Declarations.

W. "**Property Damage**" means:

1. physical injury to or destruction of any tangible property, including the loss of use thereof; or

2. loss of use of tangible property which has not been physically injured or destroyed;

X. "**Retroactive Date**" means the date stated in the Declarations as such.

Y. "**Service Provider**" means a business the **Insured** does not own, operate, or control, but that the **Insured** hires for a fee pursuant to a written contract to perform services related to the conduct of the **Insured's** business, including but not limited to,

1. maintaining, managing, or controlling the **Insured's Computer Systems**;

2. hosting or facilitating the **Insured's** Internet website; or

3. providing other **Technology Services** to the **Insured**.

Z. "**Unauthorized Access**" means the gaining of access to the **Insured's Computer System** by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner.

AA. "**Unauthorized Use**" means the use of the **Insured's Computer System** by a person unauthorized by the **Insured** or a person authorized by the **Insured** who uses the **Insured's Computer System** for a purpose which is not intended by the **Insured**.

BB. "**Wrongful Act**" means any actual or alleged negligent act, error, or omission committed or attempted in the rendering or failing to render **Professional Services** by any **Insured** on behalf of the **Named Insured,** including but not limited to **Personal Injury.**

CC. "**Technology Services**" means any electronic or computer-based network services, including

1. design, analysis, development, integration, installation, programming, conversion, service, **Network Security,** support, maintenance, repair, sale, or resale of **Computer Systems,** computer networks, electronic systems, computer software, computer hardware, or computer    firmware;

2. database design and the collection, compilation, processing, warehousing, mining, storage, management, or analysis of electronic data;

3. information technology consulting, management, education, or training;

4. **Telecommunications Services;** or

5. Internet **s**ervices, including:

    a. Internet access provision, application service provision, domain name registration, or the provision of search engine, web browser, or electronic mail services;

    b. website design, programming, hosting, managing, or maintenance;

     c.  e-commerce transaction services, electronic exchange services, auction services, managed and **Network Security** services, web portal services; and

     d.  the development, design, and maintenance of chat rooms, blogs, e-mail services or bulletin boards.

DD.  **"Telecommunications Services"** means local, regional and long distance wire line and wireless dial tone access and switching services, toll free services, voice mail, call forwarding, call waiting and caller 10; ground based satellite communication services; DSL, ISDN and VoIP services; video conferencing services; paging services; basic wire maintenance; 911 emergency services; directory services and operator assistance; analysis, design, integration and conversion of telecommunication systems; directory publishing; or project management or consulting services related to any matter described in this definition.

EE.  **"Retention"** means the Self-Insured Retention identified in the Declarations or the Deductible identified in the Declarations, whichever the Named Insured has opted to purchase, as indicated in the Declarations.

## III. EXCLUSIONS

This Policy shall not apply to any **Damages** or **Claims Expenses** incurred with respect to any **Claim:**

A.  based upon or arising out of any actual or alleged dishonest, criminal, intentional, malicious or fraudulent act, error or omission or any willful violation of any statute or regulation by an **Insured,** if a final adjudication adverse to such **Insured** establishes such a dishonest, criminal, intentional, malicious or fraudulent act, error or omission or willful violation.

B.  for **Bodily Injury** to, or sickness, disease or death of any person, or to **Property Damage**; however, this Exclusion shall not apply to emotional distress or mental anguish caused (i) by **Professional Services**; or (ii) a **Privacy Event** and Insuring Agreement B is purchased**;**

C.  based upon or arising out of any written demand, litigation, proceeding, administrative action or hearing brought prior to or pending as of the Prior and Pending Litigation Date as stated in the Declarations as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the same or similar essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing;

D.  based upon or arising out of any circumstance, if written notice of such circumstance has been given under any policy of which this Policy is a direct or indirect renewal or replacement and if such prior policy affords coverage (or would afford such coverage except for the exhaustion of its limits of liability) for such **Claim**, in whole or in part, as a result of such notice;

E.  based upon or arising out of any actual or alleged violation of the Employee Retirement Income Security Act of 1974, and amendments thereto, or similar provisions of any federal, state or local statute or common law;

F.  based upon or arising out of any gaining by the **Insured** of any profit, remuneration or advantage to which such **Insured** was not legally entitled, including the disgorgement of any such profit, remuneration or financial advantage by the **Insured**, if a final adjudication adverse to such **Insured** establishes such conduct;

G.  based upon or arising out of any actual or alleged liability assumed by the **Insured** in any express, implied, actual, constructive, oral or written contract, warranty, guarantee or promise, including liquidated damages or penalties of any nature pursuant to a contract or agreement of any kind, but this exclusion shall not apply to liability of the **Insured** which would exist in the absence of such contract or agreement;

H.  based upon or arising out of any actual or alleged discrimination, humiliation or harassment, including but not limited to a **Claim** based on an individual's race, creed, color, age, gender, national origin, religion, disability, marital status or sexual preference;

I.  based upon or arising out of any actual or alleged activities of an **Insured** as, or an **Insured** acting in, the capacity as:

   1.  an officer, director, partner, trustee or employee of a pension, welfare, profit sharing, mutual or investment trust or fund, charitable organization, corporation or business enterprise, other than the **Named Insured;**

   2.  a public official, employee, or agent of a governmental body, subdivision, or agency, unless the **Insured** is deemed to be a public official, employee, or agent of such entity solely by virtue of rendering **Professional Services** to it; or

   3.  a fiduciary under the Employee Retirement Income Security Act of 1974, and amendments thereto, or similar provisions of any federal, state or local statute or common law;

J.  based upon or arising out of the **Insured's** actual or alleged intentional failure to disclose the loss of **Personal Information** in violation of any law or regulation. Solely with respect to the applicability of this exclusion under Insuring Agreement B., only facts pertaining to and knowledge possessed by any principal, partner, officer, director or organizational equivalent of an **Insured** shall be imputed to other **Insureds**;

K.  based upon or arising out of any actual or alleged certification or acknowledgment by an **Insured** in the capacity as a notary public of a signature on a document which the **Insured** did not personally witness being placed on the document;

L.  based upon or arising out of the actual, alleged or threatened discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any watercourse or body of water, including an aquifer or groundwater;

M.  based upon or arising out of any actual or alleged species of fungi, including mold, mildew and any mycotoxins, mold allergens, spores, scents or byproducts produced or released by fungi;

N.  by any **Insured** under this insurance against another **Insured**;

O.  made against any **Insured** as the beneficiary or distributee of any trust or estate;

## IV.  TERRITORY

This Policy applies to any **Wrongful Act** committed by the **Insured** anywhere in the world, provided that suit is brought or **Claim** is made within the United States, its territories and possessions.

## V.  LIMITS OF LIABILITY

A.  The liability of the **Company** for all **Claim Expenses** and **Damages** for each **Claim** first made against the Insured and reported to the Company during the Policy Period, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations for each **Claim**.

B.  The total liability of the **Company** for all **Claim Expenses** and **Damages** for all **Claims** first made against the Insured and reported to the Company during the Policy Period, the Automatic Extended Reporting Period or the Optional Extended Reporting Period, if purchased, shall not exceed the amount stated in the Declarations as **Policy Period Aggregate**.

C. The Limit of Liability for **Claims** first made and reported during the Automatic Extended Reporting Period or the Optional Extended Reporting Period shall be part of, and not in addition to the Limit of Liability as stated in the Declarations and as stated above.  If any **Insured** has purchased or does purchase other insurance covering **Claims** first made and reported during the Automatic Extended Reporting Period or the Optional Extended Reporting Period, the coverage provided under this Policy for such **Claims** shall apply in excess of such insurance.

D. The amount shown as Each Claim under Retention shall be applicable to all **Claim Expenses** and **Damages** for each and every **Claim** and shall remain the responsibility of the **Insured** subject to the amount shown as Policy Period Aggregate under Retention on the Declarations.  A single Each Claim **Retention** shall apply to **Claims**  arising from the same or related **Wrongful Acts.**

   If Deductible is shown as Type on the Declarations, the  **Insured** will pay to the **Company**  all **Claim Expenses** and **Damages**  up to the Each Claim amount or Policy Period Aggregate amount, as applicable.  Such amount shall be paid by the **Insured** within thirty (30) days of written demand by the **Company**.  The Each Claim and Policy Period Aggregate Limits of Insurance shall be reduced by the amount of such deductibles incurred and such deductibles are a part of, and not in addition to, the Limits of Insurance.

   If Self-Insured Retention is shown as Type on the Declarations, the **Insured** will pay all **Claim Expenses** and **Damages**  up to the Each Claim amount or Policy Period Aggregate amount, as applicable, as a condition precedent to payment of any **Claim Expenses** or **Damages** by the **Company** hereunder. The Each Claim and Policy Period Aggregate shown under Retention for Self-Insured Retention on the Declarations are in addition to the Each Claim and Policy Period Aggregates Limits of Insurance, respectively.

E. **Multiple Insureds, Claims and Claimants.**  The inclusion herein of more than one **Insured**  shall not operate to increase the **Company's** Limit of Liability.  **Claims** alleging, based upon, arising out of or attributable to the same **Wrongful Act(s)** or **Interrelated Wrongful Acts** shall be treated as a single **Claim** regardless of whether made against one or more than one **Insured**.  All such **Claims**, whenever made, shall be considered first made during the **Policy Period**, the Automatic Extended Reporting Period, or Optional Extended Reporting Period, if purchased, in which the earliest **Claim** arising out of such **Wrongful Act(s)** or **Interrelated Wrongful Acts** was first made, and all such **Claims** shall be subject to the Limit of Liability and Retention set forth in such Policy.

F. Subject to all limits of liability described in A., B., C., and E., above, the total liability of the **Company** under any policy or policies not specifically issued as an excess policy for each **Claim** to which this Policy applies shall not exceed the amount stated in the Declarations under Maximum Limit as each **Claim** regardless as to the number or type(s) of coverages or policies, whether issued by the **Company** or any of its affiliates, that apply.

   Subject to all limits of liability described in A., B., C., and E., above, the total liability of the **Company** under any policy or policies not specifically issued as an excess policy for all **Claims** to which this Policy applies shall not exceed the amount stated in the Declarations under Maximum Limit as Policy Period Aggregate regardless as to the number or type(s) of coverages or policies, whether issued by the **Company** or any of its affiliates, that apply.

## VI. DUTIES IN THE EVENT OF A CLAIM

A. **Notice of Claims.**  As a condition precedent to coverage under this Policy, the **Insured** shall provide the **Company** written notice of any **Claim** made against any **Insured** as soon as practicable, but in no event later than: (i) the expiration date of this Policy; (ii) the expiration of the Automatic Extended Reporting Period; or (iii) the expiration of the Optional Extended Reporting Period, if purchased.

   In the event a **Claim** is brought against any **Insured**, the **Insured** shall forward to the **Company** every demand, notice, summons, complaint or other process or any threat of an intention to hold the **Insured**

responsible for any **Wrongful Act** received directly by the **Insured** or by the **Insured's** representatives. Written notice of any **Claim** against any **Insured**, as well as of each demand on or suit against the **Insured**, shall be delivered to the **Company** as follows:

1. **By Mail:**           AmTrust North America
                          P.O. Box 650767
                          Dallas, TX 75265-0767

2. **By Fax:**            (877) 669-9140

3. **By Electronic Mail:**  professionalclaims@amtrustes.com

B. **Assistance and Cooperation of the Insured.**  The **Insured** shall cooperate with the **Company** and upon the **Company's** request shall (i) provide to the **Company** copies of documents and such other things held by or available to the **Insured** which relate to any **Claim** or to the **Wrongful Act**, transactions or other events which shall have given rise to such **Claim**, (ii) submit to examination and interview by a representative of the **Company**, under oath if required, (iii) attend hearings, depositions and trials, and (iv) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense.

The **Insured** shall further cooperate with the **Company** and do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment which any **Insured** may have.  The **Insured** shall exercise the right to either reject or demand the arbitration of any **Claim** made against the **Insured** in accordance with the written instructions of the **Company**.  The **Insured** shall not, except at the **Insured's** own cost, make any payment, admit any liability, settle any **Claims**, or assume any obligation, provided, however, if this Policy is subject to a Self-Insured Retention, the **Insured** shall have the right to make any settlement of any **Claim** covered by the terms of this Policy subject to the condition that the aggregate amount of such settlement and of the **Claim Expenses** incurred in connection with such **Claim** shall not exceed the Self-Insured Retention identified in the Declarations.

## VII. NOTICE OF CIRCUMSTANCE/CLAIMS MADE EXTENSION

If during the **Policy Period** any **Insured** first becomes aware or has reasonable grounds to suspect that an **Insured** has committed or may have committed a specific **Wrongful Act** for which coverage is otherwise provided hereunder, and provided the **Insured** during the **Policy Period** gives notice to the **Company** of:

A. the specific **Wrongful Act**;

B. the injury or damage which has resulted or may result from such **Wrongful Act**; and

C. the circumstances by which the **Insured** first became aware of or suspected such  **Wrongful Act**;

then any **Claim** that may subsequently be made against any **Insured** arising out of such **Wrongful Act** shall be deemed for the purposes of this insurance to have been made during the **Policy Period**.

## VIII. EXTENDED REPORTING PERIODS

A. **Automatic Extended Reporting Period.**  If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Company** shall provide the **Named Insured** an automatic and noncancellable extension of this Policy, subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the ninety (90) days immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise

covered by this insurance.  This Automatic Extended Reporting Period shall terminate after ninety (90) days from the effective date of such nonrenewal or cancellation.

B.  **Optional Extended Reporting Period.**  If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Named Insured**, upon payment of an additional premium as set forth herein, shall have the option to extend this Policy, subject otherwise to its terms, Limit of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the Optional Extended Reporting Period as purchased immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance.  The extension, if purchased, shall be endorsed hereto and shall be referred to as the "Optional Extended Reporting Period."  The premium and the extension period for the Optional Extended Reporting Period, if purchased, shall be determined by the **Company** to be agreed to by the **Insured**.

C.  The **Named Insured's** option to elect the Optional Extended Reporting Period must be exercised by notice in writing to the **Company** not later than thirty (30) days after the effective date of the nonrenewal or cancellation of this Policy.  If the premium for the Optional Extended Reporting Period is not paid within thirty (30) days of the effective date of the nonrenewal or cancellation of this Policy, the option to elect the Optional Extended Reported Period shall be void.

D.  At the commencement of the Optional Extended Reporting Period, the entire premium shall be deemed fully earned, and in the event the **Named Insured** terminates the Optional Extended Reporting Period for any reason, the **Company** shall not be liable to return to the **Named Insured** any portion of the premium for the Optional Extended Reporting Period.

E.  Unless expressly waived by the **Company**, As a condition precedent to the **Named Insured's** option to elect the Optional Extended Reporting Period, any and all premiums and **Retentions** that are due must have been paid and the **Named Insured** must have complied with all other terms and conditions of this Policy.  If such conditions precedent are not satisfied or if the notice required under this Section VII. C. is not timely given to the **Company**, the **Named Insured** shall not at a later date be able to exercise such option.

F.  If this Policy is cancelled or nonrenewed due to the nonpayment of premium, the Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**.   The Automatic Extended Reporting Period or Optional Extended Reporting Period shall not be available to any **Insured**: (i) whose fraud causes this Policy to be cancelled or nonrenewed, or (ii) whose license, right to practice, or right to conduct business has been revoked, suspended by, or surrendered at the request of, any regulating authority.

G.  The fact that the period during which **Claims** must first be made against the **Insured** and reported to the **Company** under this Policy is extended by virtue of any Automatic Extended Reporting Period or Optional Extended Reporting Period shall not in any way increase the Limits of Liability of this Policy.

H.  The first ninety (90) days of the Optional Extended Reporting Period, if purchased, shall run concurrently with the Automatic Extended Reporting Period.

I.  **Nonpracticing Reporting Period.** If any **Insured** (except any part time, per diem, of counsel, or independent contract attorney) shall permanently retire or otherwise cease the private practice of law during the **Policy Period,** then such **Insured,** upon payment of an additional premium, which shall be determined by the **Company** and agreed to by the **Insured**, shall have the option to extend the insurance afforded by this Policy subject otherwise to its terms, limit of liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** and reported to the **Company** during such Nonpracticing Extended Reporting, as elected by such **Insured,** immediately following the date of the expiration of this Policy or the effective date of this Policy's cancellation, if sooner, hereinafter referred to as the "Nonpracticing Reporting Period." Coverage for the Nonpracticing Reporting Period shall only apply to a **Wrongful Act** committed or alleged to have been committed by the **Insured** in rendering or failing to

render **Professional Services** before the **Insured**'s date of retirement or cessation of the private practice of law and which is otherwise covered by this Policy and, provided further that there is no other insurance in effect on or after the **Insured**'s date of retirement or cessation of the practice of law which covers the **Insured** for such liability or **Claim** and the **Insured** has not engaged in the practice of law since retirement or when he or she otherwise ceased the practice during the **Policy Period.**  Any such other insurance shall render coverage for the Nonpracticing Reporting Period inapplicable and of no force or effect, even if the limits of liability of such other insurance may be inadequate to pay all losses and **Claim Expenses** and/or the deductible amount and deductible provisions of such other insurance may be different from those of this Policy.

The extension of coverage for the Nonpracticing Reporting Period shall be endorsed to this Policy, if elected.

As a condition precedent to any **Insured** electing the Nonpracticing Reporting Period, the full annual premium of this Policy and any Retentions that are due must have been paid and all other terms and conditions of this Policy must have been fully complied with. The Nonpracticing Reporting Period shall not be available when any **Insured**'s license or right to practice his or her profession is revoked, suspended by or surrendered at the request of any regulatory or judicial authority.

The **Insured**'s right to elect the Nonpracticing Reporting Period must be exercised by written notice not later than sixty (60) days after the expiration date of this Policy or the effective date of this Policy's cancellation, if sooner. Such notice must indicate the total extension period desired and must include full payment of premium, if any, for such Nonpracticing Reporting Period.

## IX.  GENERAL CONDITIONS

A.  **Subrogation.**  In the event of any payment under this Policy, the **Company** shall be subrogated to all the **Insured's** rights of recovery therefore against any person or organization.  The **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights and the **Insured** shall do nothing to prejudice such rights.  Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to **Damages** and/or **Claim Expenses** paid by the **Insured** in excess of the Limits of Liability hereunder; third, to **Damages** and/or **Claim Expenses** paid by the **Company**; fourth, to **Damages** and **Claim Expenses** paid by the **Insured** in excess of the retention; and last, to repayment of the retention.

B.  **Action Against the Company.**  No action shall lie against the **Company** unless, as a condition precedent thereto, the **Insured** shall have fully complied with all the terms of this Policy, nor until the amount of the obligation of the **Insured** to pay shall have been fully and finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Company**.  In the event any person or organization or the legal representative thereof has secured a judgment against an **Insured** and such judgment remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon the attorney for the **Insured**, or upon the **Insured**, and upon the **Company**, then an action may, except during a stay or limited stay of execution against the **Insured** on such judgment, be maintained against the **Company** under this Policy for the amount of such judgment to the extent of the insurance afforded by this Policy.  Nothing contained in this Policy shall give any person or organization the right to join the **Company** as a party in any action against any insured to determine the **Insured's** liability.  Bankruptcy or insolvency of any **Insured** or of the **Insured's** estate shall not relieve the **Company** of any of its obligations hereunder.

C.  **Application.**  In issuing this Policy, the **Company** has relied upon the statements, representations and information contained in the **Application**.  Every **Insured** acknowledges and agrees that all such statements, representations and information (i) are true and accurate, (ii) were made or provided in order to induce the **Company** to issue this Policy, and (iii) are material to the **Company's** acceptance of the risk

to which this Policy applies.  If any of the statements, representations or information in the **Application** are not true and accurate, there shall be no coverage for any **Claim** under this Policy with respect to any **Insured Person** who knew, as of the effective date of the **Policy Period**, of such information that was not truthfully and accurately disclosed in the **Application.**  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage.

D.   **False or Fraudulent Claims**.  If any **Insured** shall commit fraud in proffering any **Claim,** whether as to the amount of the **Claim** or otherwise, this insurance shall be void as to such **Insured** from the date such fraudulent **Claim** is proffered.

E.   **Other Insurance.**  This insurance shall be excess over any other valid and collectable insurance available to the **Insured** whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided in this Policy.

F.   **Changes.**  Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Company** shall not affect a waiver or a change in any part of this Policy or estop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy.

G.   **Assignment.**  Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed in writing hereon.

H.   **Cancellation.**  This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**.  If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the premium hereon or the Earned Minimum Premium set forth in the Declarations.  This Policy may also be canceled by or on behalf of the **Company** by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice stating when not less than ninety (90) days after the date of such notice the cancellation shall be effective.  The proof of delivery of such notice shall be sufficient proof of notice.  If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon.  The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due.

I.   **Conformity to Statute.**  Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy are hereby amended to conform to such laws.

J.   **Singular Form of a Word.**  Whenever the singular form of a defined word is used herein, the same shall include the plural when required by context.

K.   **Named Insured Authorization.**  By acceptance of this Policy, the **Named Insured** agrees to act on behalf of every **Insured** with respect to the payment or return of premium, the receipt and acceptance of any endorsements, the cancellation of the Policy, the negotiation of renewal, and the giving and receiving of any notice provided for by the terms and conditions of this Policy.

L.   **Mergers and Acquisitions.**

1.   If, during the **Policy Period**, the **Named Insured** acquires a majority of the assets of another entity, creates another entity, or acquires any entity by merger into or consolidation with the **Named Insured**, such entity shall not be covered under this Policy unless the **Insured**, prior to such acquisition or creation:

a.   gives written notice of such acquisition or creation to the **Company**;

b.   pays any additional premium required by the **Company**; and

c.   agrees to any additional terms and conditions of this Policy as required by the **Company**.

2. If, during the **Policy Period**, any of the following events occur:

    a.    the acquisition of the **Named Insured**, or all of or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

    b.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least 50% of the partners, principals, or directors of the **Named Insured**,

then, coverage under this Policy will continue in full force and effect until the termination of this Policy, but only with respect to **Claims** for **Wrongful Acts** taking place before such event.  Coverage under this Policy will cease as of the effective date of such event with respect to **Claims** for **Wrongful Acts** taking place after such event.

M.  **Bankruptcy.**  The bankruptcy or insolvency of the **Insured s**hall not relieve the **Company** of its obligations nor deprive the **Company** of its rights or defenses under this Policy.

POLICY NUMBER: AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 014 01 14**

# POLICYHOLDER'S GUIDE TO REPORTING A PROFESSIONAL LIABILITY CLAIM

A.  As soon as you are aware of an event that will give rise to a claim being made against you, please be sure to immediately report the matter to AmTrust North America.  Be sure to include your policy number and the name of the insured as it is stated on the policy.

B.  New claims may be reported 24/7 to **AmTrust North America** as follows:

|  |  |  |
|---|---|---|
| 1. | **By Mail:** | AmTrust North America<br>P.O. Box 650767<br>Dallas, TX 75265-0767 |
| 2. | **By Fax:** | (877) 669-9140 |
| 3. | **By Electronic Mail:** | professionalclaims@amtrustes.com |
| 4. | **By Telephone:** | (866) 272-9767 |

C.  **AmTrust North America** Claim Office may be reached as follows:

|  |  |  |
|---|---|---|
| 1. | **By Mail:** | AmTrust North America<br>135 S. LaSalle St. Suite 1925<br>Chicago, IL. 60603 |
| 2. | **By Telephone:** | Jay Fenton        312-803-6083<br>Paul Poppish    312-803-4630 |
| 3. | **By Fax:** | 312-781-0423 |

This page intentionally left blank

POLICY NUMBER: AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 017 01 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL TERRORISM EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** based upon, arising out of, or involving in any way "an act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002" as amended.

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER:  AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 031 01 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION

In consideration of the premium charged it is hereby understood and agreed that:

I.   This Policy does not apply:

    A.   Under any coverage part, to **Bodily Injury** or **Property Damage**

        1.   with respect to which an **Insured** under this Policy is also an insured under a nuclear liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        2.   resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.   Under any Medical Payments Coverage, or any Supplementary Payments Provision relating to first aid, to expenses incurred with respect to **Bodily Injury** resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

    C.   Under any Liability Coverage, to **Bodily Injury** or **Property Damage** resulting from the hazardous properties of nuclear material, if

        1.   the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (b) has been discharged or dispersed therefrom;

        2.   the nuclear material is contained in spent fuel or waste at any time possessed, handled, use, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

        3.   the **Bodily Injury** or **Property Damage** arises out of the furnishing by an **Insured** of **Professional Services**, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such nuclear facility and any property threat

II.   As used in this endorsement:

    "hazardous properties"  include radioactive, toxic or explosive properties;

    "nuclear material" means source material, special nuclear material or by-product material;

"source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof,

"spent fuel"  means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste"  means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under Paragraph (a) or (b) thereof,

"nuclear facility" means:

1. any nuclear reactor,

2. any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing spent fuel, or (c) handling, processing or packaging waste,

3. any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

4. any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor"  means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**"Property Damage"** is amended to include all forms of radioactive contamination of property.


All other terms and conditions remain unchanged.

POLICY NUMBER:    AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 043 01 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SPECIFIC  CLAIM  EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that this Policy does not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

**Schedule**



Description of Claim: RBS HODLINGS, INC FKS GORDON & FERGUSON OF DELEAARE INC. VS WATCHTEL & MASYR

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER: AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 050 01 14**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# MINIMUM RETAINED PREMIUM

It is hereby understood and agreed that paragraph IX.H. is deleted in its entirety and replace with the following:

**Section IX.  GENERAL CONDITIONS**

**H.  Cancellation.**  This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**.  If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the premium hereon or $ 37,556      .  This Policy may also be canceled by or on behalf of the **Company** by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice stating when not less than ninety (90) days after the date of such notice the cancellation shall be effective.  The proof of delivery of such notice shall be sufficient proof of notice.  If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon.  The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due.

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER: AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 067 01 14**

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# COVERAGE ENHANCEMENTS FOR PREFERRED RISKS LAWYERS

In consideration of the premium charged, it is hereby understood and agreed that this Policy shall be amended as follows:

1.  The following insuring agreements shall be added to Section I. of this Policy:

    **Section I.          INSURING AGREEMENTS**

    **F.    Supplementary Payments.** The **Company** will reimburse the **Insured** up to $1,000 for loss of earnings to each **Insured** for each day or part of a day such **Insured** is in attendance or in preparation, at the request of the **Company**, at a trial, hearing or arbitration proceeding, involving a **Claim** against such **Insured**. The maximum amount payable by the **Company** hereunder shall be $25,000 despite the number of **Insureds**, the number of days the **Insured** is in attendance, or the number of trials, hearings or arbitration proceedings that the **Insured** is required to attend.

    **G.    Crisis Event Expenses.**  If during the **Policy Period** the **Named Insured** experiences a **Crisis Event**, the **Company** will reimburse the **Insured** for **Crisis Event Expenses** incurred in responding to such **Crisis Event**. The maximum payment by the **Company** pursuant to this coverage shall be $100,000 for each **Policy Period** regardless of the number of **Crisis Events** or **Insureds**. Any payment by the **Company** pursuant to this coverage shall not apply to the applicable **Retention**, but shall reduce and be subject to the Limits of Liability. The **Company** shall not pay **Damages** pursuant to this coverage.

    **H.    Pre-Claim Assistance Coverage.**  If during the **Policy Period** the **Insured** gives notice to the **Company** under **Section VII.**, **NOTICE OF CIRCUMSTANCE/CLAIMS MADE EXTENSION**, the **Company** will pay all expenses incurred by the **Company** or by the **Insured** with the **Company's** consent resulting from any investigation of the **Wrongful Act** involved in the notice. The **Company** will pay such expenses under this provision only until a **Claim** is made against the **Insured** arising out of such **Wrongful Act**. However, the maximum amount payable, regardless of the number of notices reported or the number of **Insureds** subject to all notices shall be $10,000 per **Policy Period.** Any payment by the **Company** pursuant to this coverage shall not apply to the **Retention**, but shall reduce and be subject to the Limits of Liability.

2.  The following shall be added to **Section V. D.**:

    If the **Company** and the **Insured** agree to use arbitration or mediation to resolve a **Claim**, and the **Company** and the **Insured** subsequently resolve the **Claim** by arbitration or mediation, then the **Retention** obligation of the **Insured** shall be reduced by fifty percent (50%) to a maximum reduction of $25,000.

3.  **Section I. D.**, of this Policy shall be deleted in its entirety and replaced with the following:

    **D.    Consent to Settle.** The **Insured** shall make or cause to be made such investigation and defense as reasonably necessary and, subject to prior written authorization by the **Company**, may effect settlement. The **Company** will reimburse the **Insured** for **Claim Expenses** and **Damages** in excess of the applicable **Retention** as set forth in the Declarations, if any, and subject to the applicable Limits of Liability set forth in the Declarations. The **Company** shall have the right to make any separate investigation it deems necessary and, with the written consent of the **Insured**, make any settlement of a **Claim** covered by this Policy. If the **Company** recommends settlement or compromise of a **Claim**, and the **Insured** refuses to give written consent to settlement as recommended by the **Company**, then the **Insured** thereafter shall negotiate or defend such **Claim** independently of the **Company** and on the

**AES PL 067 01 14**                              AmTrust E&S Insurance Services, Inc.                              **Page 1 of 4**

This page intentionally left blank

Insured's own behalf. In such event, the **Insured** shall be solely responsible for fifty percent (50%) of all **Claim Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the **Company**, and the **Insured** shall also be responsible for fifty percent (50%) of all **Damages** in excess of the amount for which settlement could have been made as recommended by the **Company**; provided that the **Company's** liability under this Policy for such **Claim** shall not exceed the remaining portion of the applicable Limits of Liability.

4.  Section II.D., Section II.V., and Section II. BB. shall be deleted in their entirety and replaced with the following:

    **Section II.         DEFINITIONS**

    **D.   Claim Expenses** means:
      **1.**   fees charged by any lawyer selected by mutual agreement between the **Company** and the **Insured**. However, if the **Company** and the **Insured** cannot agree on the selection of the lawyer after a good faith attempt, the **Company** shall select the lawyer; and

      **2.**   all other fees, costs and expenses resulting from the investigation, and defense of a **Claim**, if incurred by the **Company** or by the **Insured** with the written consent of the **Company**. **Claims Expenses** shall not include compensation of any employee or officer of the **Insured** or any supervisory counsel retained by the **Insured**. The determination by the **Company** as to the reasonableness of **Claims Expenses** shall be conclusive on the **Insured**.

    **V.   Professional Services** means:
      **1.**   services provided by any **Insured** to others as a lawyer, mediator, arbitrator, notary public or **Lobbyist** but solely for services on behalf of the **Named Insured** or Predecessor Firm designated in the Declarations; or

      **2.**   investment advisor activities performed by any **Insured** as an administrator, conservator, receiver, executor, guardian, trustee, but only if the act or omission in dispute is directly related to the rendering of services ordinarily performed as a lawyer, and then only to the extent that such services are on behalf of and inure to the benefit of the **Named Insured** or Predecessor Firm designated in the Declarations. It is agreed that a sublimit of liability of $100,000 shall apply to investment advisor activities and this amount shall be part of and not in addition to the Limit of Liability stated on the Declarations; or

      **3.**   services performed by any **Insured** as an administrator, conservator, receiver, executor, guardian, trustee, or in any other fiduciary capacity, but only if the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer and then only to the extent that such services are on behalf of and inure to the benefit of the **Named Insured** or Predecessor Firm designated in the Declarations.

    **BB.  Wrongful Act** means any actual or alleged act, error, or omission committed or attempted in the rendering or failing to render **Professional Services**, **Non-Profit Services** or **Publishing** by any **Insured** on behalf of the **Named Insured,** including but not limited to **Personal Injury.**

5.  The following definitions shall be added to **Section II.** of this Policy:

    **Section II.         DEFINITIONS**

    **FF.  Crisis Event** means any:

      **1.**   **Wrongful Act**;

      **2.**   death, departure or debilitating illness of a member of the board of managers, director, partner, officer, principal, risk manager, or in-house general counsel of the **Named Insured**;

      **3.**   potential dissolution of the **Named Insured**;

      **4.**   incident of workplace violence at any of the **Named Insured's** offices; or

      **5.**   other event, that the **Named Insured** reasonably believes will have a material adverse effect upon the **Named Insured's** reputation.

This page intentionally left blank

**GG.** **Crisis Event Expenses** means reasonable fees, costs, and expenses incurred by the **Named Insured** for consulting services provided by a public relations firm to the **Named Insured** in response to a **Crisis Event.** The determination by the **Company** as to the reasonableness of **Crisis Event Expenses** shall be conclusive on the **Insured**.

**HH.** **Lobbyist** means a lawyer who is registered in accordance with any federal or state statute governing the conduct of lobbyists.

**II.** **Non-Profit Entity** means any non-profit corporation, community chest, fund or foundation that is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code.

**JJ.** **Non-Profit Services** means services provided by any **Insured** while serving in the capacity as a:

    **1.** director, officer or committee member of an attorneys' bar association; or

    **2.** director, officer or trustee of a **Non-Profit Entity;**

but solely for services provided on behalf of the **Named Insured** or Predecessor Firm designated in the Declarations.

**KK.** **Publishing** means creating and producing any material directly related to the practice of law in any format for distribution or sale to others, including preparing materials, or presenting seminars, for continuing legal education credit, provided that such activity is performed on behalf of, and with the consent of, the **Named Insured** or Predecessor Firm designated in the Declarations.

6.  Section VIII. I., shall be deleted and replaced with the following:

**Section VIII.**     **EXTENDED REPORTING PERIODS**

**I.** **Nonpracticing Reporting Period.** If any **Insured** (except any part time, per diem, of counsel, or independent contract attorney) shall permanently retire or otherwise cease the private practice of law during the **Policy Period,** then such **Insured,** upon payment of an additional premium set forth herein, shall have the option to extend the insurance afforded by this Policy subject otherwise to its terms, limits of liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** and reported to the **Company** during (a) 12 months, (b) 24 months, or (c) 36 months, as elected by such **Insured,** immediately following the date of the expiration of this Policy or the effective date of this Policy's cancellation, if sooner, hereinafter referred to as the "Nonpracticing Reporting Period." Coverage for the Nonpracticing Reporting Period shall only apply to a **Wrongful Act** committed or alleged to have been committed by the **Insured** in rendering or failing to render **Professional Services** before the **Insured's** date of retirement or cessation of the private practice of law and which is otherwise covered by this Policy and, provided further that there is no other insurance in effect on or after the **Insured's** date of retirement or cessation of the practice of law which covers the **Insured** for such liability or **Claim** and the **Insured** has not engaged in the practice of law since retirement or when he or she otherwise ceased the practice during the **Policy Period.** Any such other insurance shall render coverage for the Nonpracticing Reporting Period inapplicable and of no force or effect, even if the limits of liability of such other insurance may be inadequate to pay all losses and **Claim Expenses** and/or the deductible amount and deductible provisions of such other insurance may be different from those of this Policy.

The extension of coverage for the Nonpracticing Reporting Period shall be further endorsed to this Policy, if elected.

The premium for the Nonpracticing Reporting Period, if elected by the **Insured,** shall be (a) 100% for 12 Months, (b) 135% for 24 Months, and (c) 150% for 36 Months, of the full annual premium per insured lawyer for this Policy. This additional premium shall be waived once the **Insured** maintains three (3) consecutive years of coverage with the **Company.**

However, any lawyer (i) who qualifies as an **Insured** and who dies, except by suicide, or (ii) who was the sole proprietor, partner (including the shareholder of an incorporated partner), shareholder, member or employed lawyer of the **Named Insured** and who becomes **Totally and Permanently Disabled,** shall be entitled to a Nonpracticing Reporting Period at no additional premium conditioned on the following:

This page intentionally left blank

1.  the **Insured** was employed by the **Named Insured** during the **Policy Period** and suffered death or was **Totally and Permanently Disabled** during the **Policy Period**;

2.  in the event the **Insured** is **Totally and Permanently Disabled,** the **Insured** was totally and continuously disabled from practicing law for a minimum of six months prior to the election of the Nonpracticing Reporting Period option; and

3.  satisfactory written evidence of the **Insured's** death or that the **Insured** is **Totally and Permanently Disabled** is provided to the **Company** within ninety (90) days following the death or disability.

For purposes of this endorsement only, "**Totally and Permanently Disabled**" is defined as follows:

"**Totally and Permanently Disabled**" means:

1.  A person cannot engage in any substantial gainful activity because of a physical and/or mental condition; and

2.  A doctor determines said condition(s) has lasted or can be expected to last continuously for at least a year or can lead to death.

The Limits of Liability stated in the Declarations and described in **Section V. LIMITS OF LIABILITY** of this Policy shall not be reinstated for **Claims** first made against the **Insured** during the Nonpracticing Reporting Period, if elected by such **Insured.**

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER: AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 088 01 14**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# OPTIONAL EXTENDED REPORTING PERIOD AMENDMENT

In consideration of the premium charged, it is hereby understood and agreed that Section VIII. B. of this Policy shall be deleted in its entirety and replaced with the following:

**SECTION VIII.   EXTENDED REPORTING PERIODS**

**B**.   **Optional Extended Reporting Period**. If the **Company** or the **Named Insured** shall cancel or refuse to renew this Policy, then the **Named Insured**, upon payment of an additional premium as set forth herein, shall have the option to extend this Policy, subject otherwise to its terms, Limits of Liability, exclusions and conditions, to apply to **Claims** first made against the **Insured** during the 12, 24, 36, 48, or 60 months as purchased immediately following the effective date of such nonrenewal or cancellation, for any **Wrongful Act** committed before the effective date of such nonrenewal or cancellation and after the **Retroactive Date**, and otherwise covered by this insurance. The extension, if purchased, shall be referred to as the "Optional Extended Reporting Period." The premium for the Optional Extended Reporting Period, if purchased, shall be 12 months at 100%, 24 months at 150% ,36 months at 175% , 48 months at 200%, or 60 months at 250% of the full annual premium for this Policy, plus any additional premium owed for this Policy

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER: AES1058242 01                                    **PROFESSIONAL LIABILITY**
                                                                **AES PL 134 10 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MODIFIED CANCELLATION PROVISION – NONPAYMENT OF PREMIUM ONLY

In consideration of the premium charged, it is hereby understood and agreed that **IX. GENERAL CONDITIONS**, **H.** is deleted in its entirety and replaced with the following:

**Section IX.  GENERAL CONDITIONS**

H.   **Cancellation.** This Policy may be canceled by the **Named Insured** by mailing or delivering prior written notice to the **Company** or by surrender of this Policy to the **Company**. If this Policy is canceled by the **Named Insured**, the **Company** shall retain the greater of the customary short rate proportion of the premium hereon or the Earned Minimum Premium set forth in the Declarations.

The **Company** may cancel this Policy on ten (10) days notice for nonpayment of premium due by delivering to the **Named Insured** by registered, certified or other first class mail, or by electronic means, written notice. The proof of delivery of such notice shall be sufficient proof of notice. If this Policy is canceled by or on behalf of the **Company**, the **Company** shall retain the pro rata proportion of the premium hereon.

All other terms and conditions remain unchanged.

**AES PL 134 10 15**              AmTrust E&S Insurance Services Inc.              **Page 1 of 1**

This page intentionally left blank

POLICY NUMBER : AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 138 10 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COVERAGE FOR PREDECESSOR FIRMS

In consideration of the premium charged, it is hereby understood and agreed that the following Predecessor Firms are added to the Policy:

    Wachtel, Masyr & Missry, LLP

    Wachtel & Masyr, LLP

All other terms and conditions remain unchanged.

This page intentionally left blank

POLICY NUMBER:  AES1058242 01

**PROFESSIONAL LIABILITY**
**AES PL 145 08 16**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MODIFIED PRIOR & PENDING EXCLUSION

This endorsement modifies the insurance provided under the following:

**LAWYERS' PROFESSIONAL LIABILITY POLICY**

Section **III. EXCLUSIONS, C.** is deleted in its entirety and replaced with the following:

**C.** based upon, arising out of, or attributable to any written demand, litigation, proceeding, administrative  action or hearing known or reasonably foreseen by any **Insured** brought prior to or pending as of the Prior and Pending Litigation Date as stated in the Declarations, as well as any future litigation, proceeding, administrative action or hearing based upon any such pending or prior litigation, proceeding, administrative action or hearing or derived from the same or similar essential facts or circumstances underlying or alleged in any such pending or prior litigation, proceeding, administrative action or hearing;

All other terms and conditions remain unchanged.

This page intentionally left blank

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# IDENTITY RECOVERY COVERAGE

## IDENTITY THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

The following is added as an Additional Coverage.  If this is being endorsed onto a multi-section form, it is added to the Property section:

### IDENTITY RECOVERY COVERAGE

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met:

1. There has been an "identity theft" involving the personal identity of an "identity recovery insured" under this policy; and

2. Such "identity theft" is first discovered by the "identity recovery insured" during the policy period for which this Identity Recovery coverage is applicable; and

3. Such "identity theft" is reported to us within 60 days after it is first discovered by the "identity recovery insured."

If all three of the requirements listed above have been met, then we will provide the following to the "identity recovery insured":

1. **Case Management Service**
   Services of an "identity recovery case manager" as needed to respond to the "identity theft"; and

2. **Expense Reimbursement**
   Reimbursement of necessary and reasonable "identity recovery expenses" incurred as a direct result of the "identity theft."

This coverage is additional insurance.

### EXCLUSIONS

The following additional exclusions apply to this coverage:

We do not cover loss or expense arising from any of the following:

1. The theft of a professional or business identity.

2. Any fraudulent, dishonest or criminal act by an "identity recovery insured" or any person aiding or abetting an "identity recovery insured", or by any authorized representative of an "identity recovery insured", whether acting alone or in collusion with others. However, this exclusion shall not apply to the interests of an "identity recovery insured" who has no knowledge of or involvement in such fraud, dishonesty or criminal act.

3. An "identity theft" that is not reported in writing to the police.

### LIMITS

Case Management Service is available as needed for any one "identity theft" for up to 12 consecutive months from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

Expense Reimbursement coverage is subject to a limit of $15,000 annual aggregate per "identity recovery insured." Regardless of the number of claims, this limit is the most we will pay for the total of all loss or expense arising out of all "identity thefts" to any one "identity recovery insured" which are first discovered by the "identity recovery insured" during a 12-month period starting with the beginning of the present annual policy period. If an "identity theft" is first discovered in one policy period and continues into other policy periods, all loss and expense arising from such "identity theft" will be subject to the aggregate limit applicable to the policy period when the "identity theft" was first discovered.

Legal costs as provided under item d. of the definition of "identity recovery expenses" are part of, and not in addition to, the Expense Reimbursement coverage limit.

Item e. (Lost Wages) and item f. (Child and Elder Care Expenses) of the definition of "identity recovery expenses" are jointly subject to a sublimit of $5,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item g. (Mental Health Counseling) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to counseling that takes place within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

Item h. (Miscellaneous Unnamed Costs) of the definition of "identity recovery expenses" is subject to a sublimit of $1,000. This sublimit is part of, and not in addition to, the Expenses Reimbursement coverage limit. Coverage is limited to costs incurred within 12 months after the first discovery of the "identity theft" by the "identity recovery insured."

## DEDUCTIBLE

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to a deductible of $100. Any one "identity recovery insured" shall be responsible for only one deductible under this Identity Recovery Coverage during any one policy period.

## CONDITIONS

The following additional conditions apply to this coverage:

**A. Help Line**

For assistance, the "identity recovery insured" should call the **Identity Recovery Help Line** at **1-877-645-7434**.

The **Identity Recovery Help Line** can provide the "identity recovery insured" with:

1. Information and advice for how to respond to a possible "identity theft"; and

2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an "identity recovery insured" prior to a determination that a covered "identity theft" has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered "identity theft" has not occurred.

As respects Expense Reimbursement Coverage, the "identity recovery insured" must send to us, within 60 days after our request, receipts, bills or other records that support his or her claim for "identity recovery expenses."

**B. Services**

The following conditions apply as respects any services provided by us or our designees to any "identity recovery insured" under this endorsement:

1. Our ability to provide helpful services in the event of an "identity theft" depends on the cooperation, permission and assistance of the "identity recovery insured."

2. All services may not be available or applicable to all individuals. For example, "identity recovery insureds" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.

3. We do not warrant or guarantee that our services will end or eliminate all problems associated with an "identity theft" or prevent future "identity thefts."

**DEFINITIONS**

With respect to the provisions of this endorsement only, the following definitions are added:

1. **"Identity Recovery Case Manager"** means one or more individuals assigned by us to assist an "identity recovery insured" with communications we deem necessary for re-establishing the integrity of the personal identity of the "identity recovery insured." This includes, with the permission and cooperation of the "identity recovery insured," written and telephone communications with law enforcement authorities, governmental agencies, credit agencies and individual creditors and businesses.

2. **"Identity Recovery Expenses"** means the following when they are reasonable and necessary expenses that are incurred as a direct result of an "identity theft":

   a. Costs for re-filing applications for loans, grants or other credit instruments that are rejected solely as a result of an "identity theft."

   b. Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage solely as a result of your efforts to report an "identity theft" or amend or rectify records as to your true name or identity as a result of an "identity theft."

   c. Costs for credit reports from established credit bureaus.

   d. Fees and expenses for an attorney approved by us for the following:

      (1) The defense of any civil suit brought against an "identity recovery insured."

      (2) The removal of any civil judgment wrongfully entered against an "identity recovery insured."

      (3) Legal assistance for an "identity recovery insured" at an audit or hearing by a governmental agency.

      (4) Legal assistance in challenging the accuracy of the "identity recovery insured's" consumer credit report.

      (5) The defense of any criminal charges brought against an "identity recovery insured" arising from the actions of a third party using the personal identity of the "identity recovery insured."

   e. Actual lost wages of the "identity recovery insured" for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

   f. Actual costs for supervision of children or elderly or infirm relatives or dependants of the "identity recovery insured" during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   g. Actual costs for counseling from a licensed mental health professional. Such care must be provided by a professional care provider who is not a relative of the "identity recovery insured."

   h. Any other reasonable costs necessarily incurred by an "identity recovery insured" as a direct result of the "identity theft."

      (1) Such costs include:

         (A) Costs by the "identity recovery insured" to recover control over his or her personal identity.

         (B) Deductibles or service fees from financial institutions.

      (2) Such costs do not include:

         (A) Costs to avoid, prevent or detect "identity theft" or other loss.

         (B) Money lost or stolen.

         (C) Costs that are restricted or excluded elsewhere in this endorsement or policy.

3. **"Identity Recovery Insured"** means the following:

   a. When the business  insured under this policy is a sole proprietorship, the "identity recovery insured" is the individual person who is the sole proprietor of the insured business and their spouse or domestic partner.

   b. When the entity insured under this policy is a partnership, the "identity recovery insureds" are the current partners.

c.  When the entity insured under this policy is a corporation or other organization, the "identity recovery insureds" are all individuals having an ownership position of 20% or more of the insured entity. However, if and only if there is no one who has such an ownership position, then the "identity recovery insured" shall be:

    (1)  The chief executive of the insured entity; or

    (2)  As respects a religious institution, the senior ministerial employee.

An "identity recovery insured" must always be an individual person. The entity insured under this policy is not an "identity recovery insured."

4.  **"Identity Theft"** means the fraudulent use of the social security number or other method of identifying an "identity recovery insured." This includes fraudulently using the personal identity of an "identity recovery insured" to establish credit accounts, secure loans, enter into contracts or commit crimes.

"Identity theft" does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

All other provisions of this policy apply.

# Privacy Policy
## Associated Industries Insurance Company, Inc.

We value your business and trust in us and respect the privacy and confidentiality of your nonpublic personal information.

### Our Practices Regarding Privacy and Confidentiality

We are committed to keeping your information secure and confidential, regardless of whether information is received by mail, telephone, Internet or in person.

The nonpublic personal information about you that is collected is utilized only to the extent necessary to effect, deliver, administer or enforce insurance service to you and is disclosed only as permitted by law.  We may also disclose certain information to nonaffiliated third parties.

If you prefer that we not disclose nonpublic personal information about you to third parties, you may opt out of those disclosures, that is, you may direct us not to make those disclosures by contacting us at the address and phone number listed below.

Likewise, to the extent we utilize other organizations, such as general agents and third party administrators, to support our business; we require them to abide by the requirements of the applicable privacy laws and by our privacy policy.

### Information We Collect

We gather information about you in connection with providing our products and services to you and to support our business operations.  This includes information you may provide to us, such as from your insurance application, and information about you from another source, such as a credit bureau.

### Information We May Disclose To Affiliates or Third Parties

Except as noted herein, we do not disclose nonpublic personal information unless authorized by you.  We may, without authorization but only as permitted or required by law, provide nonpublic personal information about you to persons or organizations both inside and outside of Associated Industries Insurance Company, Inc. in order to fulfill a transaction requested, service policies, investigate and/or handle claims, detect and/or prevent fraud, participate in insurance support organizations, or comply with lawful requests from regulatory or law enforcement authorities or a court of law. These include, for example: affiliated companies, claims adjusters or administrators, insurance agents or brokers, medical providers, program managers, consumer reporting agencies, governmental agencies, auditors, lienholders, mortgagees, and assignees.

### Information Confidentiality and Security

We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you.  We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

### Access to Your Information

You have the right to know what kind of information we keep in our files about you, to have the reasonable access to it and receive a copy. Contact us at the address noted below should you have questions about what information we may have on file.  All written requests must include your name, address, telephone number, and a photocopy of a picture ID for identification purposes.  We are dedicated to maintaining accurate customer records and shall strive to correct any inaccurate information noted in a timely manner.

**Associated Industries Insurance Company, Inc.**
Associated Industries Insurance Company, Inc.
P.O. Box 318004
Cleveland, OH 44131-0880
Attention:  Privacy Manager

AES PN 08 11

This page intentionally left blank