```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
ASSOCIATED INDUSTRIES INSURANCE                             :
COMPANY, INC.,                                              :
                                        Plaintiff,          :    21 Civ. 3624 (LGS)
                                                            :
              -against-                                     :    OPINION AND ORDER
                                                            :
WACHTEL MISSRY LLP, et al.,                                 :
                                        Defendants.         X
------------------------------------------------------------
```

LORNA G. SCHOFIELD, District Judge:

Plaintiff Associated Industries Ins. Co., Inc. ("AIIC") seeks a declaratory judgment that it is not obligated to defend or indemnify Defendants Wachtel Missry LLP (the "Firm") and Howard Kleinhendler, a former partner at the Firm, in connection with malpractice claims asserted against Defendants in the Eastern District of New York. Plaintiff moves for judgment on the pleadings on Count III of the Complaint and dismissal of the Firm's counterclaims. For the reasons stated below, Plaintiff's motion is granted, subject to the parties' affirmative defenses.

### I.   BACKGROUND

The following facts are taken from the SAC and documents attached to it. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306 (2d Cir. 2021). The facts are construed in the light most favorable to Defendants as the non-moving party and presumed to be true for the purpose of this motion. *Id.* at 299 n.1.

#### A.   The Policy

On or about October 23, 2018, AIIC issued Policy AES1058242 01 (the "Policy") to the Firm for the Policy Period October 19, 2018, to October 19, 2019. The Policy includes liability

limits of $5,000,000 per claim and $5,000,000 in the aggregate, and a self-insured retention of $100,000 per claim.

The Policy's Insuring Agreement A provides, "The Company shall pay Damages and Claim Expenses . . . that the Insured shall become legally obligated to pay as a result of a Claim made against the Insured for a Wrongful Act."  The Policy defines Insured to include, among others, "the Named Insured" -- here, the Firm -- and "any individual . . . who was a partner . . . of the Named Insured, but solely while acting within the scope of their duties as such on behalf of the Named Insured in rendering Professional Services."  The Policy defines Professional Services, as:

> services . . . provided by any Insured  to others as a lawyer, mediator, arbitrator or notary public but solely for services on behalf of the Named Insured  or Predecessor Firm designated in the Declarations; or . . .  performed by any Insured  as an administrator, conservator, receiver, executor, guardian, trustee, or in any other fiduciary capacity, but only if the act or omission in dispute is in the rendering of services ordinarily performed as a lawyer and then only to the extent that such services are on behalf of and inure to the benefit of the Named Insured  or any Predecessor Firm designated in the Declarations."

The Policy defines a Wrongful Act as "any actual or alleged negligent act, error, or omission committed or attempted in the rendering or failing to render Professional Services by any Insured on behalf of the Named Insured, including but not limited to Personal Injury."

The Policy contains an exclusion stating that the Policy "shall not apply to any Damages or Claims Expenses incurred with respect to any Claim . . . based upon or arising out of any actual or alleged activities of an Insured as, or an Insured acting in, the capacity as . . . an officer, director, partner, trustee or employee of a pension, welfare, profit sharing, mutual or investment trust or fund, charitable organization, corporation or business enterprise, other than the Named Insured" (the "Business Enterprise Exclusion").

**B.    The Applestein Suit**

In December 2019, representatives of Allan Applestein and the Diatomite Corporation of America (together, the "Applestein Plaintiffs") commenced a lawsuit against Defendants. *See Applestein v. Kleinhendler*, No. 20 Civ. 1454 (E.D.N.Y.) (the "Applestein Lawsuit").[1] The Applestein Plaintiffs allege that Applestein engaged Kleinhendler and the Firm in 2010 and that the relationship continued until the spring of 2019.

In 2013, Applestein, then 81 years old, decided to sell approximately 1,000 acres of land in Richmond County, Virginia, referred to by the parties as the "Fones Cliffs Land." Applestein "sought the legal advice . . . of his trusted attorneys Kleinhendler and the [] Firm to handle the transaction and represent him in connection with this effort." The Applestein Plaintiffs allege that Kleinhendler held himself out as a partner in the Firm and used his Firm email address and signature block on his emails when communicating with Applestein, thus creating "actual and apparent agency."

Between 2013 and 2015, several potential deals to sell the Fones Cliffs Land fell through. By 2015, Applestein's health was in decline. The Appleston Plaintiffs allege that Kleinhendler saw Applestein's compromised state as an opportunity. Beginning in or around 2015, Kleinhendler allegedly convinced Applestein to pursue rezoning of the Fones Cliffs Land so that it could be developed as an elaborate mixed-use project that would include, among other things, townhomes, a golf course, and a hotel. Eventually, Kleinhendler allegedly made a pitch to Applestein that instead of selling the Fones Cliffs Land to another buyer or developing it himself, Applestein should sell it to Kleinhendler and let Kleinhendler develop it -- but "**did not advise Applestein of the inherent conflicts of interests in such a transaction**." The Applestein

---

[1] The operative complaint in the Applestein Lawsuit is attached to the Complaint as Exhibit 1.

Plaintiffs also allege that, because of Applestein's "major neurocognitive disorder," Applestein could not independently evaluate whether there were conflicts.

In 2017, Kleinhendler organized an entity -- Virginia True Corporation ("Virginia True") -- to purchase the Fones Cliffs Land, allegedly preparing all the documentation, "all the while continuing to represent Applestein." The Applestein Plaintiffs allege that, "[a]t one point, [Kleinhendler] confirmed his continuing legal representation of Applestein telling [Applestein's daughter]: 'I love your dad. I am his attorney.'"

Kleinhendler allegedly advised Applestein that the Fones Cliffs Land deal should be structured as a seller-financed transaction in which Applestein would receive a cash payment of $5 million at closing and finance the remaining balance of $7 million through a loan from Applestein to Virginia True to be evidenced by an unsecured promissory note -- rather than a mortgage. Kleinhendler also made an express promise, via a "side letter," not to encumber the Fones Cliffs Land without Applestein's prior approval.

In or around April 2017, Kleinhendler traveled to Florida to have the contract for sale, promissory note, the side letter and other necessary transaction documents signed by Applestein. At that time, the Applestein Plaintiffs allege that Kleinhendler "witnessed Applestein's patent inability to feed himself, wipe his face, or concentrate for any length of time, or otherwise conduct legal or financial business" but "still went forward with the deal and, on April 27, 2017, accepted the papers signed by his elderly, infirm, and unaware client," consummating the sale by Applestein of the Fones Cliffs Land to Kleinhendler's company, Virginia True.

At or around closing, Kleinhendler also persuaded Applestein to lend him an additional $500,000. The loan was evidenced by a $500,000 promissory note executed by HK Consulting Group, LLC, a New Jersey limited liability company that operates from Kleinhendler's home

address.  No security was given for the loan, and Kleinhendler did not guarantee its repayment.  The Applestein Plaintiffs allege that Kleinhendler and the Firm represented Applestein in connection with the making of, and documentation associated with, the $500,000 loan.

Despite the side letter, the Applestein Plaintiffs allege that, on April 27, 2017, Kleinhendler signed a conflicting agreement with two equity investors in Virginia True, the Cipollones, that provided them the right to convert their $5 million equity investment in Virginia True into debt secured by a mortgage on the Fones Cliffs Land if they did not receive a return of their investment within eighteen months.  The Cipollones later converted their equity in Virginia True to debt, and received a note for $5 million and a deed of trust.

The operative complaint in the Applestein Lawsuit asserts four causes of action against Kleinhendler and the Firm in connection with the Fones Cliffs Land transactions:  legal malpractice, breach fiduciary duty, elder abuse and fraud.

Prior to commencement of the Applestein Lawsuit, the Applestein Plaintiffs made a pre-suit demand on the Firm.  On or about August 21, 2019, the Firm timely gave AIIC notice of that pre-suit demand.  On or about June 19, 2020, AIIC sent a letter to the Firm setting forth AIIC's coverage position with respect to the Applestein Lawsuit.  AIIC stated that "[w]ithout waiver of this position or any of its rights, [AIIC] will defend Wachtel . . . under a reservation of rights."  After exhaustion of the self-insured retention on the Policy, AIIC began defending the Firm in the Applestein Lawsuit.  This action followed.

  **C.**   **Procedural History**

On April 23, 2021, AIIC commenced this action, asserting five claims of relief against Defendants and seeking a declaratory judgment that the Policy does not provide coverage for, or require Associated to defend, the Firm or Kleinhendler.

On September 7, 2021, the Firm filed its answer, asserting four counterclaims against AIIC and twelve affirmative defenses. The Firm's counterclaims seek (1) a declaratory judgment that AIIC has a duty to defend the Firm in the Applestein Lawsuit; (2) monetary damages for breach of contract for AIIC's refusal to pay all of its attorneys' fees and costs in the Applestein Lawsuit; (3) a declaratory judgment that AIIC has a duty to indemnify the Firm in the Applestein Lawsuit; and (4) monetary damage for "anticipatory breach" related to AIIC's duty to indemnify. The Firm also asserted various affirmative defenses.

Kleinhendler answered the Complaint on October 6, 2021, and asserts twelve affirmative defenses.

## II.   STANDARD

### A.   Judgment on the Pleadings

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (alteration in original) (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations

sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

### B.     Interpretation of Insurance Contracts

Under New York law,[2] "the courts bear the responsibility of determining the rights or obligations of parties under insurance contracts based on the specific language of the policies." *Gilbane Bldg. Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 97 N.E.3d 711, 712 (N.Y. 2018). "In determining a dispute over insurance coverage, we first look to the language of the policy." *Id.* "As with the construction of contracts generally, unambiguous provisions of an insurance contract must be given their plain and ordinary meaning." *Id.* at 712-13 (internal quotation marks omitted). "If a provision is ambiguous, such as when it may reasonably be interpreted in two conflicting manners, it must be resolved in favor of the insured and against the insurer who drafted the contract." *State Farm Mut. Auto. Ins. Co. v. Glinbizzi*, 780 N.Y.S.2d 434, 436 (3d Dep't 2004) (citing *Mostow v. State Farm Ins. Cos.*, 668 N.E.2d 392, 393 (N.Y. 1996)). "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404, 406 (N.Y. 1996). "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Mostow*, 668 N.E.2d at 394 (internal citation omitted). "[A] contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable

---

[2] This Opinion applies New York law as the parties both assume that New York is the applicable substantive law, "and such implied consent . . . is sufficient to establish choice of law." *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014); *accord Vuksanovich v. Airbus Americas, Inc.*, No. 21 Civ. 3454, 2022 WL 2274543, at *5 n.3 (S.D.N.Y. June 23, 2022) (same).

7

basis for a difference of opinion." *In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1151 (N.Y. 2016) (internal quotation mark omitted).

### III.    DISCUSSION

AIIC's motion for judgment on the pleadings is granted, subject to Defendants' affirmative defenses. The unambiguous terms of the Policy's Business Enterprise Exclusion negate any obligation to provide coverage for the Applestein Lawsuit. *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co., No. 11*, 71 N.E.3d 556, 561 (N.Y. 2017) (concluding that there was no coverage for loss where exclusion applied); *accord 7951 Albion, LLC v. Clear Blue Specialty Ins. Co.*, 548 F. Supp. 3d 321, 326 (E.D.N.Y. 2021) ("Even if an insurance policy provides coverage, the insurer may nevertheless have no duty to defend or indemnify by virtue of an exclusion.").

The Policy covers "Damages and Claim Expenses . . . that the Insured shall become legally obligated to pay as a result of a Claim made against the Insured for a Wrongful Act." AIIC does not dispute that Kleinhendler is an Insured as that term is defined within the Policy.[3]

The Business Enterprise Exclusion bars coverage for "any Claim . . . based upon or arising out of any actual or alleged activities of an Insured as, or an Insured acting in, the capacity as . . . an officer, director, partner, trustee or employee of a . . . corporation or business enterprise, other than the Named Insured[.]" The Policy defines "Claim" as "a written demand received by the Insured for monetary Damages which alleges a Wrong Act, including the service of a suit or any civil proceeding in a court of law or equity" The "arising out of" language in an insurance policy exclusion requires that the alleged activities are a but-for cause of the loss.

---

[3] In its Memorandum of Law in support of the instant motion, Plaintiff states that Kleinhendler is an Insured under the Policy, apparently abandoning its Second Claim for Relief.

*McGraw-Hill Educ., Inc. v. Illinois Natl. Ins. Co.*, 116 N.Y.S.3d 16, 17 (1st Dep't 2019) ("For a claim to 'arise' out of a contract, the existence of the contract must be the 'but for' cause of the loss." (citing *Mount Vernon*, 668 N.E.2d 404)); *MIC Gen. Ins. Corp. v. Cabrera*, No. 20 Civ. 4855, 2021 WL 5909975, at *8 (S.D.N.Y. Dec. 10, 2021) (same, applying New York law).

The Business Enterprise Exclusion applies because the Applestein Complaint alleges that Kleinhendler's activities on behalf of Virginia True and/or HK Consulting -- i.e., "corporation[s] or business enterprise[s], other than the [Firm]" -- are a "but for" cause of the alleged loss alleged in the Applestein Lawsuit.  *See McGraw-Hill Educ., Inc.*, 116 N.Y.S.3d at 17.  The Applestein Lawsuit alleges that while Kleinhendler was simultaneously acting as Virginia True's Executive Vice President and as Applestein's attorney, Kleinhendler recommended that Applestein sell the Fones Cliffs Land to Virginia True, a company that Kleinhendler organized to purchase the land "while continuing to represent Applestein"; that Kleinhendler prepared the documentation that effected the sale for $12 million; that Kleinhendler structured the transaction so that Virginia True would pay Applestein $5 million up front and owe the remaining $7 million through an unsecured loan with no mortgage on the land and that Kleinhendler breached the side letter agreement with Applestein by structuring a transaction with his Virginia True investors that resulted in their imposing a $5 million lien on the property.  The Applestein Lawsuit also alleges that Kleinhendler acted as the owner and principal of HK Consulting when it borrowed $500,000 from Applestein/Diatomite.

The Applestein Lawsuit therefore "aris[es] out" of Kleinhendler's conflicted capacity because the Applestein Plaintiffs would have no claim to pursue against the Firm and/or Kleinhendler "but for" Kleinhendler's "dual roles of providing legal advice to a client, while simultaneously pursuing his own business interests" with that client as the counterparty  *See Lee*

9

*& Amtzis, LLP v. Am. Guarantee & Liability Ins. Co.*, 7 N.Y.S.3d 80, 84 (1st Dept. 2015) ("[B]y assuming dual roles of providing legal advice to a client, while simultaneously pursuing his own business interests, [a lawyer] placed himself, his law partner and the law firm firmly within the exclusions in the professional policy plaintiffs seek protection under."); *see also Law Offices of Zachary R. Greenhill, P.C. v Liberty Ins. Underwriters*, 46 N.Y.S.3d 105, 107 (1st Dept. 2017) ("[I]t is clear from the pleadings in the underlying action and this action . . . that the allegations in the counterclaims bring plaintiffs' claims under the policy "solely and entirely" within the [exclusion], since they arise out of [the plaintiff's] capacity as the president and CEO of [another entity]." (internal citations omitted)).

The Business Enterprise Exclusion bars coverage of both Insureds, Kleinhendler and the Firm, because the exclusion is triggered by "any Claim" arising out of activities of "an Insured." The Applestein Lawsuit is the "Claim," and it is asserted against both Insureds, the Firm and Kleinhendler. Kleinhendler's excluded non-Firm business activities consequently operate as a bar to coverage for the Firm as well in connection with the Applestein Lawsuit. Because the allegations in the Applestein Lawsuit fall within the Business Enterprise Exclusion, AIIC has no coverage obligation to Defendants under the Policy.

Defendants argue that the Business Enterprise exception does not apply because (1) the Applestein Lawsuit alleges wrongful acts that are not confined to the transaction with Virginia True and that took place years before it was contemplated and (2) includes allegations of legal malpractice that "arise only with respect to Kleinhendler's capacity as attorney for the Applestein Plaintiffs." For example, Defendants point to allegations that the Firm provided Applestein with legal "services as his attorney from 2010 until the spring of 2019"; Kleinhendler "failed to exercise that degree of care, skill, and diligence commonly possessed and exercised"

10

by an attorney; Kleinhendler "failed to advise Applestein of the prudence of having a mortgage, deed of trust, or other form of security" in connection with a Fones Cliffs sale; and "the Firm's alleged advice resulted in a *bona fide* purchaser for the property being rejected, not once, but twice." Defendants argue that these allegations either pre-date Kleinhendler's conflict or do not allege Kleinhendler acted in the "capacity" of an officer of a business enterprise other than the Firm. These arguments are unpersuasive.

First, to the extent Defendants argue that the Business Enterprise Exclusion does not bar coverage where allegations of "legal malpractice" exist, that argument misses the mark. The exclusion applies to any claim, including legal malpractice claims, where Kleinhendler's conduct on behalf of Virginia True or some other entity was a but-for cause of the loss. The Policy excludes such claims where, as here, the alleged malpractice is based on the insured's intermingling of his business relationships and his law practice. Since "the alleged malpractice occurred because [Kleinhendler] was serving two masters -- plaintiffs, his clients, and [Virginia True], the company of which he was a principal . . . it can fairly be said that the malpractice claims arose partly out of [Kleinhendler's] law practice and partly out of his status with or activity for [Virginia True] -- precisely the situation that the insured's status and business enterprise exclusions seem to contemplate." *K2 Inv. Grp., LLC v. Am. Guarantee & Liab. Ins. Co.*, 6 N.E.3d 1117, 1121 (N.Y. 2014); *accord Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP v. Underwriters at Lloyd's, London*, 918 F. Supp. 2d 114, 121 (E.D.N.Y. 2013).

Second, the Business Enterprise Exclusion operates as a bar to coverage because all of the claims in the Applestein Lawsuit are premised on Kleinhendler's dual and conflicted capacity, acting both as a lawyer and "in the capacity as" an officer, director or employee of a

business enterprise, and ultimately leading to the Applestein Plaintiffs' alleged loss. The legal malpractice claim in the operative complaint in the Applestein Lawsuit alleges:

> Defendants were entering into a business transaction with Plaintiffs where Plaintiffs had an expectation that Defendants would exercise professional judgment for Plaintiffs' protection. . . . Defendants' interest in the business transaction to purchase the Fones Cliffs Land differed from Plaintiffs' interest . . . [and] Defendants failed to advise Plaintiffs of the conflicting interests."

The breach of fiduciary duty claim similarly alleges: "Defendants breached their duties of care, loyalty, candor, rectitude, and good faith to Plaintiffs by negotiating and entering a transaction where Defendants' interests were adverse to Plaintiffs." The elder abuse claim alleges: "Defendants exploited Applestein by knowingly deceiving him for the purpose of obtaining the Fones Cliffs Land with the intent to deprive Applestein of the use, benefit, value, or possession of the Fones Cliffs Land." The fraud claim alleges: "It was Defendants' intent to deceive and defraud Plaintiffs in order to induce his reliance upon the misrepresentations that Defendants made with the express purpose of inducing Plaintiffs to sell Virginia True the Fones Cliffs Land." These allegations make clear that Kleinhendler's dual-role and related conflict-of-interest are central to, and a "but for" cause of each claim and the Applestein Plaintiffs' resulting losses.

Defendants argue that, apart from any duty to defend, a ruling on Plaintiff's duty to indemnify the Firm would be premature. This argument is incorrect. The exclusion by its terms bars any coverage obligation. The Policy states that the Policy "shall not apply to any Damages or Claims Expenses incurred with respect to any [excluded] Claim." "Damages" is defined as "any compensatory sum which the Insured becomes legally obligated to pay and includes monetary judgments or settlements" and refers to the duty to indemnify. "Claims Expenses" is defined as "reasonable and necessary fees charged by an attorney" and refers to the duty to

12

defend. *See Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 116 (2d Cir. 1995) (concluding that because the claims "fall plainly within the exclusion provision," the insurer "has no duty to defend or indemnify" the insured (emphasis added)); *MIC Gen. Ins. Co. v. Allen*, 697 F. App'x 717, 720 (2d Cir. 2017) (same).

Defendants rely on case law that is not binding and in any event is distinguishable because the coverage obligation in those cases depended on facts that were yet to be determined in the underlying lawsuit. *See, e.g.*, *Bhd. Mut. Ins. Co. v. Ludwigsen*, No. 16 Civ. 6369, 2018 WL 4211319, at *17 (S.D.N.Y. Sept. 4, 2018) (finding "any claim regarding indemnification is not ripe" where "the current record lacks undisputed facts that preclude or mandate application of an exclusion"); *Specialty Nat'l. Ins. Co. v. Eng. Bros. Funeral Home*, 606 F. Supp. 2d 466, 472 (S.D.N.Y. 2009) (indemnity premature because "duty to indemnify . . . rests on facts to be determined in the underlying lawsuits."). Here, by contrast, the exclusion is triggered by a "Claim," which is defined as "a written demand received by the Insured for monetary Damages which alleges a Wrong Act, including the service of a suit or any civil proceeding in a court of law or equity" -- not by any ultimate adjudication -- and can be determined now based on the Applestein Complaint. As explained above, because of the exclusion, Plaintiff has no obligation to provide a defense or indemnification for the Applestein Lawsuit.

The Firm's and Kleinhendler's respective Answers assert twelve purported affirmative defenses. They are the same except for the Twelfth Affirmative Defense. Most of these are not viable because of the rulings above -- i.e., failure to state a claim (First); breach of the Policy (Fifth); AIIC owes Defendants a duty to defend (Sixth); plain meaning of the policy (Seventh); ripeness (Ninth); prematurity (Tenth); reservation of rights (Firm – Twelfth); and failure to join Virginia True as a necessary party (Kleinhendler – Twelfth). In addition, the affirmative defense

of improper venue (Eleventh) is not viable because of the Court's prior ruling denying Defendant's motion to transfer.

The remaining affirmative defenses are beyond the scope of this motion for judgment on the pleadings and, at least theoretically, may be viable notwithstanding the rulings above. These remaining affirmative defenses assert statute of limitations, laches, waiver and/or equitable estoppel (Second); Plaintiff's inequitable or wrongful conduct (Third); unclean hands (Fourth); and subject matter jurisdiction (Eighth). No later than September 15, 2022, each Defendant shall file a letter identifying any affirmative defense consistent with the rulings above and believed to have a good faith factual and legal basis, and describing the same. If a Defendant does not file a timely letter, the Court will deem that Defendant's affirmative defenses abandoned.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings as to the Third Claim for Relief is granted, subject to the affirmative defenses: the Policy does not provide coverage for, or require Plaintiff to defend, the Firm or Kleinhendler by operation of the Policy's Exclusion. Plaintiff's First, Second, Fourth and Fifth Claims for Relief are dismissed as moot. Defendants' counterclaims are dismissed as moot.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 51.

Dated: September 8, 2022
      New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**