| From: | Chicago CA Workflow<ChicagoCAWorkflow@amtrustgroup.com> on behalf of Chicago CA Workflow</O=AMTRUST NORTH AMERICA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0B4E11210BE9425AB2BD6EE1A3DA78C3-CH> |
|---|---|
| Sent on: | Wednesday, August 21, 2019 11:48:12 AM |
| To: | Cynthia Herrera <Cynthia.Herrera@amtrustgroup.com> |
| Subject: | FW: Allan Applestein v. Wachtel Missry and Howard Kleinhendler-FIRST REPORT OF LOSS - Wachtel Missry LLP AMtrust Policy # AES Redacted  Evanston Excess Policy # Redacted |
| Urgent: | High |

**Attachments:** image001.png (2.54 KB), image002.png (5.15 KB), image004.jpg (3.78 KB)

**Categories:** New Claim

Patty

| Program | E&S |
|---|---|
| Policy Number | AES Redacted |
| Insured Name | Wachtel Missry LLP |
| Claimant Name | Allan H Applestein |
| Date of Loss | 08/21/2019 |
| State | VA |
| Loss Description | Negligence |
| Insured Contact | Howard Kleinhendler<br>Redacted<br>Hkleinhendler@wmllp.com |
| Agent / Broker Contact | cheryl.white@usi.com |
| Adjuster | Tim Jacobs |
| Type of Loss (BI or PD) | PD |

Amaris Branch, Professional Liability
Clerical Supervisor
AmTrust Financial Services, Inc.
233 N. Michigan Avenue
Chicago, Illinois 60601

312.803.6082 office
Amaris.Branch@amtrustgroup.com
www.amtrustgroup.com

*(Image has been removed and will appear at end of document.)*

**From:** Cheryl White <CHERYL.WHITE@usi.com>
**Sent:** Wednesday, August 21, 2019 8:36 AM
**To:** 'newclaims@markelcorp.com' <newclaims@markelcorp.com>; Professional Claims <ProfessionalClaims@amtrustgroup.com>
**Cc:** 'CDiaz@programbrokerage.com' <CDiaz@programbrokerage.com>
**Subject:** [EXTERNAL] Allan Applestein v. Wachtel Missry and Howard Kleinhendler-FIRST REPORT OF LOSS - Wachtel Missry LLP AMtrust Policy # AES[Redacted] Evanston Excess Policy # [Redacted]
**Importance:** High

Attached please find a demand letter received by the above captioned insured. Please confirm receipt and advise claim # and adjustors contact information.

The contact for the insured that has information on the matter is:
Howard Kleinhendler
212-909-9522
Hkleinhendler@wmllp.com


CHERYL L. WHITE-LEYS, CIC
Senior Risk Consultant
Chernoff Diamond | A Division of USI
725 RXR Plaza, East Tower, Uniondale, NY 11556
d: 516.534.3441 | c: 516.554.2891
cheryl.white@usi.com| www.usi.com | www.chernoffdiamond.com

*(Image has been removed and will appear at end of document.)*

*(Image has been removed and will appear at end of document.)*


THE USI ONE ADVANTAGE®
Our Approach to Delivering Client Solutions ▶ Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

**From:** Evan Weintraub <WEINTRAUB@wmllp.com>
**Sent:** Tuesday, August 20, 2019 4:37 PM
**To:** Michael Aronson <MICHAEL.ARONSON@usi.com>
**Subject:** FW: Allan Applestein v. Wachtel Missry and Howard Kleinhendler
**Importance:** High

**CAUTION:**
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you suspect the email is not legitimate or a phishing email, please forward it as an attachment to SPAM@usi.com or contact the Service Desk at x88888.

Michael:
We received the attached demand letter while I was out late last week.
After you review, let's discuss.
I believe we have to notify the carrier.


Evan Weintraub, Esq.
WACHTEL MISSRY LLP
One Dag Hammarskjold Plaza
885 Second Avenue | New York, NY 10017
Telephone: (212) 909 – 9519 | Facsimile: (212) 909 – 9422

CONFIDENTIAL

AIIC01851

Email: weintraub@wmllp.com | Website: www.wmllp.com

IMPORTANT NOTICES: NOTICE UNDER E-SIGN ACT: Unless specifically set forth herein, the transmission of this communication is not intended to be a legally binding electronic signature; and no offer, commitment or assent by or on behalf of the sender or the sender's client is expressed or implied by the sending of this email, or any attachments hereto. NOTICE OF ATTORNEY'S CONFIDENTIALITY: This email is confidential and may also be privileged. If you are not the intended recipient please delete it and notify us immediately by telephoning or e-mailing the sender. You should not copy it or use it for any purpose nor disclose its contents to any other person.

****************************************
U.S. Treasury Circular 230 Notice: Any U.S. federal tax advice included in this communication was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal tax penalties.
****************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.



# PRYOR CASHMAN LLP

New York | Los Angeles | Miami

1801 Century Park East, Los Angeles, CA 90067  Tel: 310-683-6900  Fax: 310-943-3397   www.pryorcashman.com

**Thomas H. Vidal**

Direct Tel: 310-683-6992
Direct Fax: 310-943-3397
TVidal@PRYORCASHMAN.com

**VIA EMAIL AND U.S. MAIL**

Howard Kleinhendler
Wachtel Missry LLP
One Dag Hammarskjold Plaza
885 2nd Ave., Floor 47
New York, NY 10017

Wachtel Missry LLP
One Dag Hammarskjold Plaza
885 2nd Ave., Floor 47
New York, NY 10017
Attn: Morris Missry, Managing Partner

Re: *Allan Applestein v. Howard Kleinhendler and Wachtel Missry*

Gentlemen:

Please be advised that we represent Diatomite Corporation of America and its elderly principal Allan H. Applestein (collectively, "Applestein") in connection with their claims against Wachtel Missry ("Wachtel" or the "Firm") and Howard Kleinhendler, individually and in his capacity as a partner of Wachtel. As you are aware Applestein has been, until recently, a long-time client of the Firm.

Applestein's claims against the Firm and Mr. Kleinhendler arise out of gross negligence, elder abuse, and breaches of fiduciary duties in rendering legal counsel and advice, which resulted in Applestein selling approximately 1,000 acres of real property located in Richmond County, Virginia (the "Fones Cliffs Land") to an entity controlled by Mr. Kleinhendler and his associates. Applestein had owned the Fones Cliffs Land since 1958 and used the services of Wachtel and Mr. Kleinhendler, and relied on their legal advice, for a considerable period of time with respect to his efforts to sell or otherwise dispose of the Fones Cliffs Land. Applestein has suffered in excess of seven million dollars in damages. Please direct all further correspondence regarding this matter to the undersigned.

We have conducted a preliminary investigation into this matter. Based upon that investigation, we have concluded that both Wachtel and Mr. Kleinhendler are liable to Applestein as a result of errors and omissions associated with the advice and counsel you provided and services that you rendered in connection with a land transaction, in which Mr. Kleinhendler himself was the


**PRYOR CASHMAN LLP**

Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 2

acquiring party, and which resulted in Applestein losing his land for a pittance. As set forth below, we hereby demand that you immediately pay Applestein $7,724,200.36 for the loss of the balance of the purchase price associated with the Fones Cliffs Land and a loan extended to Kleinhendler by Applestein at the time of closing, plus all the related costs, including the already-substantial and still mounting legal fees, incurred in enforcing his rights. We understand the following facts.

Factual Background

In 1958, a then-26-year-old, Applestein purchased approximately 1,000 acres of land in Richmond County, Virginia. The storied piece of land, known as the Fones Cliffs property because it lies within a four-mile cliff formation along the eastern side of the Rappahannock River, was partially situated in an environmentally sensitive and protected area.

Roughly 52 years after purchasing that land, Applestein engaged Wachtel and Mr. Kleinhendler as his attorney. Applestein was already 78 at the time he engaged the Firm. Applestein paid a $100,000.00 retainer to the Firm on December 30, 2010.

Type: All transactions &middot; Status: All statuses &middot; Name:

| Date | Type | No. | Payee | Category | Total |
|---|---|---|---|---|---|
| 12/30/2010 | Bill Payment (Check) | 21599 | Wachtel & Masyr LLP/Howard Kleinhendler | | -100,000.00 |

*Figure 1 $100,000.00 Retainer Payment*

Applestein continued to engage the Firm as his attorney from 2010 until he was recently terminated, paying an additional $175,000.00 in retainer deposits over the course of time.

Around 2015, Applestein, then 83 years old, sought to sell or develop the Fones Cliffs Land. With this objective in mind, Applestein sought the advice and counsel of his trusted adviser Kleinhendler and engaged the Firm that had been representing him for more than five years to handle the transaction and represent him in connection with this effort. The Firm accepted the matter and



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 3

performed services in connection with it, as illustrated by a sample of the time entries contained in Wachtel's billing invoices:[1]



*Figure 2 Services in connection with the Fones Cliffs Land*

Allan H. Applestein was born in 1932. He was a member of the second graduating class of Brandeis University, and then went on to graduate from Harvard Law School. He was admitted to practice law in the State of Maryland where he practiced for a short time. He later went into business and moved to Florida, where he now lives. It would be an understatement to say that Applestein had been successful in his business as an investor. Despite his success, he began to succumb to his age and failing health—a fact that Kleinhendler took a keen interest in.

From the time Wachtel and Kleinhendler began representing Applestein, Applestein already had a live-in male caregiver, Edward Brooks, known to all as Boonie. Boonie worked around the clock

---

[1] While the Firm's representation of Applestein in connection with the Fones Cliffs Land lies beyond reasonable dispute, to the extent necessary, witnesses can confirm Kleinhendler's representing of Applestein. By way of example, Robert C. Smith confirmed the representation in a declaration he submitted in the *In re: Virginia True Corporation* bankruptcy presently pending in the United States District Court for the Eastern District of New York, bearing case number CL19-42769. (Smith Decl. at ¶ 19, Dkt No. 40-1.) Smith's primary contact was Kleinhendler as attorney for the project. (*Id.*)

CONFIDENTIAL

AIIC01857



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 4

to take care of Applestein. Applestein also had a full-time chauffeur, Jose Antonio Jimenez. Kleinhendler knew each of them well.

Applestein's health, which had been diminishing due to his advanced age, started taking a steeper decline in 2015. Sensing that Applestein's declining health and mental condition presented an opportunity, Kleinhendler engaged in a yeoman's effort to ingratiate himself to Applestein.

Kleinhendler would make periodic visits to Applestein's home, ostensibly to keep Applestein company. But that was a pretense, which he used to foster Applestein's trust and friendship, all the while Kleinhendler was attempting to gather information about Applestein's personal life and financial affairs.

During his visits, Kleinhendler would inquire diligently of Applestein's staff of Applestein's health condition, familial relationships, and other information about his finances. He regularly inquired of Betz Guzman, Diatomite's *de facto* chief operating officer and Applestein's personal manager, of Applestein's physical and mental state. Kleinhendler also pumped Jimenez, the chauffeur, for information. On several occasions, Jimenez reported to Guzman that Kleinhendler's probing questions made him suspicious of Kleinhendler's motives and intentions: "It made me very uncomfortable," Jimenez would tell Guzman, "so I told him I was just the driver and I do not know about any of those things."

In the midst of all of that, Applestein was attempting to secure a buyer or find a way to develop the Fones Cliffs Land under the (supposedly) watchful eye of his lawyers, Kleinhendler and Wachtel. While various sale options were considered with other buyers, an idea to develop the land, rather than sell it, arose.

That idea ultimately became a formal proposal, managed and controlled by Kleinhendler, to rezone the Fones Cliffs Land. The original proposal submitted to the Richmond County Board of Supervisors contemplated a mixed-use: 718 homes and townhouses, 18 guest cottages, an 18-hole golf course, a 116-room hotel, a restaurant, a small commercial center, a skeet and trap range, an equestrian center with stables, a 10,000 square foot community barn, and seven piers along the river.

Eventually, Kleinhendler made a pitch to his client that instead of selling the Fones Cliffs Land to another buyer or developing it himself, Applestein should sell it to Kleinhendler and let Kleinhendler develop it. We have not found any indication that Kleinhendler advised Applestein of the inherent conflicts associated with such a proposal. Based in part on his trust in Kleinhendler (as well as his declining agency), Applestein ultimately agreed to the deal. Kleinhendler agreed to pay $12 million to acquire the Fones Cliffs Land.



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 5

By this point, Kleinhendler had spent enough time with Applestein to have observed his declining health. Nevertheless, Dr. Andrea Bivens, one of Applestein's daughters, had expressly warned Kleinhendler, "I told him my father was impaired when we were all speaking about this deal initially," she reports. She described her father's condition thusly:

> My father had been a hyper-focused, deliberate man. By the time Kleinhendler proposed this deal, my father could not sit still to partake in the discussion. For example, during a conference call with Kleinhendler, Steve Dohan, and Betz Guzman, my father left the room multiple times. His conversations (when he spoke, which even then was somewhat seldom) consisted of little more than repetitive questions: "Do you like my car? Do you want to drive it? Do you like my new car?"

Kleinhendler himself observed all of this behavior.

Indeed, during that same period, Dr. Agronin, Applestein's geriatric psychiatrist, had already advised the family to draw up powers of attorney, to assist them in managing his affairs. Kleinhendler also was aware of this because the family had to engage a family and estate planning attorney to handle that matter. That Dr. Bivens was involved in the transaction was a clear indicator of Applestein's declining mental state – when he was a younger man, Applestein was fiercely independent and would never have allowed her to be involved in his business dealings.

Applestein's infirmities aside, Kleinhendler was also conflicted. Robert Smith advised and discussed the conflict with Kleinhendler, but Kleinhendler disregarded his advice. (*See* Smith Decl. at ¶ 29.)

Nevertheless, Kleinhendler proceeded with his plan to acquire the Fones Cliffs Land. His plan culminated in the spring of 2017 when Kleinhendler organized an entity—Virginia True Corporation—which would be the vehicle to acquire the land. Kleinhendler also structured the acquisition deal, and drafted the documents, all while continuing to represent Applestein. At one point he told Bivens: "I love your dad. I am his attorney." Nothing that happened next provided any proof that his lawyer had any such fond feelings for Applestein.

Kleinhendler ultimately advised his client that the deal should be structured as a seller-financed transaction. Applestein would receive a cash payment of $5 million at closing, and finance the remaining balance of $7 million through a loan to be evidenced by a promissory note. He further persuaded his elderly and infirm client that there was no need to take any collateral or a security interest in the Fones Cliffs Land.



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 6

When asked (on more than one occasion) by Bivens and other Applestein representatives about a mortgage against the property to secure the repayment of the amount due, Kleinhendler specifically and repeatedly advised his client that security in the Fones Cliffs Land was unnecessary and would make the planned development of the land impossible. Writing to Applestein's CPA, Kleinhendler explained the situation plainly:

> **From: Howard Kleinhendler [mailto:HKleinhendler@wmllp.com]**
> Sent: Tuesday, April 25, 2017 4:43 PM
> To: Steven H. Dohan, CPA <sdohan@uscpa.com<mailto:sdohan@uscpa.com>>; 'Marian Hasty' <marian@ghlawyers.com<mailto:marian@ghlawyers.com>>
> Subject: RE: 2017-04-25 Purchase Contract Va True and Diatomite 4 25 2017.doc
>
> **No. The deal is this is unsecured loan.** If Corp does not pay, then Allan forecloses on note and takes back the company.
>
> Howard Kleinhendler
> WACHTEL MISSRY LLP
> One Dag Hammarskjold Plaza
> 885 Second Avenue | New York, NY 10017
> Telephone: (212) 909-9522   | Facsimile: (212) 909-9417
> Email: hkleinhendler@wmllp.com<mailto:hkleinhendler@wmllp.com> | Website: www.wmllp.com<http://www.wmllp.com>
>
> **From: Steven H. Dohan, CPA [mailto:sdohan@uscpa.com]**
> Sent: Tuesday, April 25, 2017 4:42 PM
> To: 'Marian Hasty' <marian@ghlawyers.com<mailto:marian@ghlawyers.com>>
> Cc: Howard Kleinhendler <HKleinhendler@wmllp.com<mailto:HKleinhendler@wmllp.com>>
> Subject: 2017-04-25 Purchase Contract Va True and Diatomite 4 25 2017.doc
>
> I have questions re yellow highlighted.
>
> **Is there no mortgage securing the $7,000,000 note?**
> Very truly yours,
>   Steven H. Dohan, CPA
> Steven H. Dohan, CPA
> Managing Director
> < image002.png>
> 10757 SW 104 Street, Miami, Florida 33176

*Figure 3. 4/25/17 email message from Kleinhendler*



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 7

Later, that same day, Kleinhendler provided more specific advice as to why his client should not take a security interest to collateralize the $7 million loan he was providing to Kleinhendler. Kleinhendler sent the following email message:

> **Re: 2017-04-25 Purchase Contract Va True and Diatomite 4 25 2017.doc**
>
> Howard Kleinhendler <HKleinhendler@wmllp.com>
> Tue 4/25/2017 5:23 PM
>
> To: Marian Hasty <marian@ghlawyers.com>
> Cc: aapplestein@msn.com <aapplestein@msn.com>; Steven H. Dohan, CPA <sdohan@uscpa.com>
>
> Ok. Please call my cell 347 840 2188. Keep in mind that the original share sale agreement signed in November does not give Allan a secured interest in the land. All he has under that deal is ability to get back his shares. ==This is same story but for tax reasons we have to acquire the land because we are donating 200 acres to new venture of which VA TRUE remains a 50% owner and we need $12 million basis.==
>
> ==Allan understands this risk== and even agreed originally with me when I was going to buy the property myself to allow me to finance his acquisition with a loan in which case he would be behind a senior lender. ==Now he is much better position because we have equity investor financing acquisition.==
>
> Howard Kleinhendler
> WACHTEL MISSRY LLP
> 885 Second Avenue
> New York, NY 10017
> (212) 909-9522
> hkleinhendler@wmllp.com<mailto:hkleinhendler@wmllp.com>

*Figure 4. 4/25/2017 email message from Kleinhendler No. 2*

Of course, having observed his then 83 year-old client for a long time, Kleinhendler knew that the opposite was true: his client, "Allan," was not capable of appreciating or understanding the risk.



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 8

Kleinhendler tried to further obscure the lack of security by crafting a nonsensical provision in the contract of purchase and sale that would require any mortgage given by a golf course developer to be transferred to Applestein or otherwise applied to pay down the promissory note.

> toward the Initial Payment at the Closing.
>
> (c)  Buyer intends to enter into a joint venture with golf course developers for the development and construction of an 18-hole championship golf course and club house on approximately 200 acres of the Property (the "Golf Course Property"), which shall be transferred to a new entity of which the Buyer shall own at least 50%. Buyer shall receive a three-year mortgage on the transferred 200 acres in an amount up to $5 million, with an interest rate of 4% per annum (the "Golf Course Mortgage"). ==The aforesaid Golf Course Mortgage shall be, at Buyer's discretion, either pledged or transferred to Seller, and should the mortgage be transferred, the face value of the mortgage shall be applied against the Promissory Note.== The allocation of Purchase Price to the Golf Course Property is set forth in **Exhibit D**. This paragraph shall survive the Closing.

*Figure 5. Obligation to transfer the mortgage*

The provision is nonsensical because Virgina True, as buyer, would never be *obtaining* a mortgage from the golf course developer, but the reverse: Virginia True would be *mortgaging* the Fones Cliffs Land to the lender. "Transferring the mortgage" to Applestein would not be possible because a lender would be the mortgagee, and even if it were possible to make such a transfer it would be meaningless. The mortgage is not an asset to Kleinhendler or Virginia True that could be "applied" against the promissory note. Yet, Kleinhendler passed this off to his client advising and representing to him that it was a mechanism that would be for Applestein's protection and would provide him with security for the repayment of the amount due.

Based on that (demonstrably) false advice, Kleinhendler was able to close a deal to have Virginia True acquire the Fones Cliffs Land, but not without a very significant additional protection he relented to include in the deal. Kleinhendler made an express promise, via a "side letter," not to encumber the Fones Cliffs Land without Applestein's approval.[2]

---

[2] There were certain narrowly defined exceptions to this approval requirement, but they are not applicable here.



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 9

That side letter provided:

> NOW THEREFORE, the Parties Agree as follows:
>
> 1. Virginia True shall not transfer any portion of the assets of Virginia True or encumber the Property, without the prior written consent of Alian Applestein and his legal counsel, except as follows:
>
>    a. Virginia True may enter into a joint venture with golf course designers as described in Section 2(c) of the Purchase Contract, provided that Virginia True shall transfer the Purchase Money Mortgage, which shall be assignable to Diatomite or its further assigns; and

*Figure 6. "Side Letter" with agreement not to encumber the land*

Kleinhendler traveled to Florida to have the contract for sale, promissory note, the side letter and the other necessary transaction documents signed by Applestein. He even went to lunch with Guzman, Boonie, and Jimenez, where they all witnessed that Applestein was unable to feed himself, wipe his face, concentrate for any length of time, or otherwise engage in any meaningful discussion. Kleinhendler nonetheless went forward with the deal and, on April 27, 2017, accepted the papers signed by his elderly, infirm, and unaware client—the same client he "loved."

When Robert Smith learned that the sale to Virginia True did not include a deed of trust on the property, he sensed something was not right: "I began to wonder if Kleinhendler had taken advantage of Mr. Applestein...." (Smith Decl. at ¶¶ 30-31.)

While the family representatives felt some relief after having obtained the protections of the side letter, this comfort provided false, as Kleinhendler never intended to live up to his promise. In fact, it is now clear that Kleinhendler intended to breach the side letter even before the ink on the signature page was dry.

On the very same day that Kleinhendler executed a deal with his and Wachtel's client to acquire that Fones Cliffs Land in which he expressly promised, in writing, that he would not encumber the land, Kleinhendler did just that. He crafted a deal with two investors in Virginia True that would ultimately allow them to impose a lien upon the property.

At the time of closing, Kleinhendler also persuaded Applestein to lend him $500,000.00. The loan was evidenced by a $500,000.00 Promissory Note executed by HK Consulting Group LLC, a New Jersey limited liability company that operates from Kleinhendler's home address. No security was given for the loan and Kleinhendler did not guaranty its repayment. Kleinhendler and the Firm



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 10

represented Applestein in connection with the making and documentation associated with the unsecured loan.

Domenick Cipollone and Anthony Cipollone agreed to invest $5 million in cash to fund Virginia True and entered a Stockholders' Agreement on April 27, 2017. All of the details associated with the Cipollone's investment in Virginia True are still to be discovered. But the terms of the agreement among the shareholders of Virginia True have been determined:

> **STOCKHOLDERS' AGREEMENT**
>
> THIS STOCKHOLDERS' AGREEMENT dated as of April 27, 2017 (this "Agreement") is made among VIRGINIA TRUE CORPORATION, a Virginia corporation, with a place of business at The Branch House, 2501 Monument Avenue, Richmond, VA 23220 (the "Company") and the Persons on the signature page hereto.
>
> **RECITALS:**
>
> WHEREAS, the Company has authorized the issuance of TWO THOUSAND SIX HUNDRED (2,600) shares of Common Stock; and
>
> WHEREAS, BENITO R. FERNANDEZ, an individual with an address at 131 Lancaster Street, Albany, New York 12210 ("Fernandez") and HOWARD KLEINHENDLER, an individual with an address at 885 Second Avenue, 47th Floor, New York, New York 10017 ("Kleinhendler"), will each receive EIGHT HUNDRED EIGHTY FOUR (884) shares of Common Stock which collectively comprises sixty-eight percent (68%) of the issued shares of the Company; and
>
> WHEREAS, DOMENICK CIPOLLONE ("Domenick") and ANTHONY CIPOLLONE ("Anthony"), individuals with an address at ADC Construction LLC, 58-08 48th Street, Maspeth, New York 11378 (collectively, the "Cipollones") will collectively receive EIGHT HUNDRED THIRTY TWO (832) shares of Common Stock (416 shares to Domenick Cipollone and 416 shares to Anthony Cipollone), which shares shall comprise thirty-two percent (32%) of the Company's issued and outstanding shares of Common Stock, in return for a payment to the Company of FIVE MILLION DOLLARS ($5,000,000); and

*Figure 7. Virginia True Stockholders' Agreement*

The Stockholders' Agreement expressly provided the Cipollones the right to convert their $5M equity investment in Virginia True into debt and to encumber the sole tangible asset of Virginia True - Fones Cliffs Land - with a mortgage if they did not receive a return of their capital 18 months after they invested:



**PRYOR CASHMAN LLP**

Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 11

> 2.6  Eighteen months from the date of this Agreement, the Cipollones may, for any reason, and upon thirty days written notice to Kleinhendler and Fernandez, compel the Company to purchase all of their Shares ("Buy-Out"); provided, however, that Kleinhendler and Fernandez may, but are not obligated to, satisfy the demand for the aforesaid Buy-Out, by paying to the Cipollones, either directly or through the Company, within ninety days of said notice of a demand for a Buy-Out, the sum of FIVE MILLION DOLLARS ($5,000,000) (the "Buy-Out Amount"). ==Should Kleinhendler, Fernandez or the Company fail to tender the Buy Out Amount, the Cipollones shall require and the Company will issue to them a Note and Mortgage against the Company's real estate.== The Note shall be for Buy Out Amount due four (4) months from the date of the expiration of the ninety (90) day period set forth above. The Note shall bear simple interest at Libor plus three (3) points and due at the expiration of the Note period.  All costs associated with the filing of the mortgage shall be borne by the Company.

*Figure 8. Cipollone right to encumber the Fones Cliff Land*

Virginia True did not honor its buy-out agreement with the Cipollones. After numerous demands by the Cipollones and the filing of a lawsuit, Kleinhendler caused Virginia True to execute a deed of trust in favor of the Cipollones. On December 12, 2018, the deed of Trust was recorded:



*Figure 9. Deed of Trust on Fones Cliffs Land*

Despite his promises to his client to the contrary, Kleinhendler facilitated and consented to the recording of a mortgage against the Fones Cliffs Land. Despite his advice and recommendation that a mortgage was unnecessary and that Applestein's interests were protected, Applestein was


PRYOR CASHMAN LLP

Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 12

not, in fact, protected. In fact, far from protected, Applestein was negligently, if not fraudulently, exposed. Virginia True has filed for bankruptcy, likely leaving Applestein unable to recover his land or obtain payment on his $7 million note or his $500,000.00 "loan."

Applestein and his family have come to discover what many of the other people and organizations involved with the Fones Cliffs development project learned, in the words of attorney Robert Smith: "It became apparent by all team members that Ben [Fernandez] and Howard [Kleinhendler] were 'corrupt snake oil salesman [sic]'...." and "earned the reputation of being 'dishonest charlatans'...." (*See* Smith Decl. at ¶¶ 38, 55.)

Claims

Based on these facts, we have concluded that there are at least four causes of action that give rise to liability to Kleinhendler and the Firm to compensate Applestein for the unpaid balance of the notes, the loss of the Fones Cliffs Land, and the attorneys' fees and costs incurred in trying to protect itself from Kleinhendler's misconduct: legal malpractice, breach of fiduciary duties, elder abuse and fraud. For purposes of this letter, we will address only the malpractice claims.

While it is likely that Florida law applies here, the elements for a cause of action for malpractice are essentially the same whether New York, Virginia or Florida law applies to this case. First, there must be an attorney-client relationship that creates a duty of care. Second, there must be a breach of that duty. Third, the client must have suffered damages that were proximately caused as a result of the breach.[3]

---

[3] *See, Larson & Larson, P.A. v. TSE Indus., Inc.*, 22 So. 3d 36, 39 (Fla. 2009); *Cummings v. Donovan*, 36 A.D.3d 648, 648 (2007); *and Williams v. Joynes*, 278 Va. 57, 62, 677 S.E.2d 261, 264 (2009).

CONFIDENTIAL
AIIC01866

**PRYOR CASHMAN LLP**

Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 13

There is no doubt that Kleinhendler and Wachtel had an attorney-client relationship with Diatomite and Applestein. Wachtel had been rendering legal services for Applestein going as far back as 2010, when the $100,000.00 retainer was paid. Kleinhendler and Wachtel were absolutely rendering professional services in connection with the Fones Cliffs Land matters, and possibly earlier than that. The time entries we have seen show that the Firm was representing Diatomite in connection with a "Virginia land deal" by no later than January 7, 2015, well before the acts complained of occurred.


Figure 10. Wachtel 6/5/18 Invoice

That relationship continued during, and even past the time that Applestein was working on developing or selling the property. In fact, Wachtel sent invoices to Diatomite as recently as June 5, 2018. All of the email communications from Kleinhendler during the time of Kleinhendler's acquisition of the Fones Cliffs Land were sent from his Wachtel email address and included the signature block of the Firm.

Applestein never terminated the relationship; neither did the Firm. Instead, and as Kleinhendler recently confirmed to Applestein's daughter: "I am Allan's attorney."

Damages and causation are not in question. Applestein entered the agreement based on advice of his trusted counsel that he did not need to have a mortgage on the Fones Cliffs Land. That property is now under a mortgage in favor of the Cipollones, Virginia True has defaulted on its promissory notes, Applestein is likely to become embroiled in a dispute with the Cipollones, and Applestein may have no adequate remedy to be made whole.

As discussed above, in addition to this claim for legal malpractice, Applestein could successfully assert claims for breach of fiduciary duty, elder abuse, and fraud.



Howard Kleinhendler, Esq.
Morris Missry, Esq.
August 9, 2019
Page 14

Demand

Based on the factual and legal analysis above, Applestein is likely to succeed on any claim he brings for legal malpractice. Consequently, we hereby demand that you compensate Applestein for his loss in the amount of $7,500,000.00 and legal fees incurred to date in the amount of $224,200.36, for a total amount of $7,724,200.36, and that you provide us with written confirmation of your intention to make this payment within seven days of this letter. We note that Applestein is continuing to incur substantial legal fees to enforce his rights and will be seeking to recover those as well, to the extent necessary.

Reservation of Rights

This letter is not meant to constitute, and should not be construed as, an exhaustive analysis or statement of our clients' actual or legal position in this matter. The letter is based on information presently available to Pryor Cashman LLP. This letter should neither be construed as a complete recitation of the pertinent facts nor a complete discussion of the legal issues or legal authorities.

Nothing set forth herein or omitted herefrom is intended as, or shall be deemed to constitute, any admission against interest, or any waiver, relinquishment or limitation of any of our client's rights, claims, interests, defenses or positions, whether actual or legal, whether at law or in equity, all of the same being hereby expressly reserved.

Conclusion

As a result of Wachtel and Kleinhendler's gross negligence and breach of fiduciary duties in advising a seller of real estate—its own client—that it did not need and could not have a mortgage to secure the financing, that client has suffered the loss of his land and more than $7 million. Please let that sink in.

As set forth above, we demand you agree to compensate Applestein by paying him $7,724,200.36 and that you notify us of your agreement to do the same within seven days of this letter. Should you fail to do the right and honorable thing here and make your client whole, we will have no choice but to file a lawsuit to obtain a judgment awarded by a Florida jury forcing you to do so.

Very truly yours,

Thomas H. Vidal